### STEPHEN F. PAGE v. WILLARD B. WELLS.

*Warranty of Employment—Measure of Damages for Loss arising from Misinformation as to Value of Land.*

He who bargains to render services undertakes for good faith and integrity, but not infallibility.

An employee is liable to his employer for negligence, bad faith, or dishonesty, but not for losses incidental to errors of judgment.

An arrangement with a land-looker by which he is to be paid if he will obtain minutes of valuable lands of a certain quality, is an employment, and not a sale of information, and implies no warranty of the absolute truth of the descriptions.

If, in furnishing descriptions of land, a land-looker misleads or injures his employer by a positive affirmation of their quality, when he knows nothing about it, he should be liable for bad faith or negligence, but not for a breach of warranty.

If a person is led to purchase lands by representations which prove untrue, the measure of damages is the difference between the value of the land as it is and what its value would have been if its condition and quality had been as represented.

The market value of a piece of land, worthless except for its timber, is not to be fixed by finding the aggregate of the estimated stumpage value of the trees growing on it.

The market value of land is not to be determined by combining the several values of its constituent parts, such as trees, gravel and clay, and its value for agricultural purposes when these are removed. Witnesses to value may take account of these things, but in their estimate must give their opinion of the market value of the land as a whole.

Error to Ionia. Submitted Oct. 3. Decided Oct. 23.

ASSUMPSIT. The facts are in the opinion.

*Mitchel & Pratt* for plaintiff in error.

*A. B. Morse* for defendant in error. Information acquired by labor and skill is salable as property, *Palmer v. De Witt*, 47 N. Y., 537, and minutes of land are personal property, subject to contract and warranty, as well as a squatter's claim, *Bowman v. Torr*, 3 Ia., 571. A warranty need not be in express words, but especially when made by one who has particular knowledge of the subject, may consist in a positive, unequivocal and express affirmation of the quality and condition of the property sold, showing an intention to warrant its quality and relied on as such instead of as a mere recommendation and expression of opinion, *Chapman v. Murch*, 19 Johns., 290; *Sweet v. Bradley*, 24 Barb., 549; *Hughes v. Funston*, 23 Ia., 259; Hilliard on Sales, 258, and when thus positive the vendor cannot claim that he did not intend his representations as a warranty, *Hawkins v. Pemberton*, 51 N. Y., 202. Money paid for information upon the strength of the information it contains, forms a consideration for a warranty of its truthfulness, *Congar v. Chamberlain*, 14 Wis., 258.

COOLEY, C. J. The special count on which a recovery was had in this cause was as follows: The plaintiff complains "for that whereas, heretofore, to-wit, on or about the 1st day of May, A. D. 1872, the said defendant being then engaged in the business of selling the descriptions of wild land, which were subject to private entry and sale by the

United States, and also by the State of Michigan, upon the recommendations and representations of the said defendant as to the quantity and value of the lands which such descriptions represented, did on the day and date aforesaid, and at the city of Ionia in the said county of Ionia, in consideration that the said plaintiff, at the special instance and request of him, the said defendant, would purchase of him, the said defendant, at and for the price of one hundred dollars for the descriptions of each and every eighty acres of land hereinafter mentioned, the minutes or particular descriptions of land by him, the said defendant, designated and named as follows, to wit: [describing a number of lots], all in town nineteen north, of range eighteen west in the county of Mason in said State, to be paid to him by the said plaintiff, to the said defendant, then faithfully undertook, promised and represented to the said plaintiff that the said lands were of the quality and had then growing thereon timber of the kind, quantity and quality hereinafter designated, that is to say, that there was then and there growing upon the said northwest quarter of the northeast quarter of said section 30, in town 19 north, of range 17 west, one hundred and fifty thousand feet feet of good quality of cork pine, trees of large size; that the soil was sandy and of second rate quality, and besides pine, said land also had growing thereon a large quantity of valuable hemlock trees intermixed with beech and soft maple [and so on, giving the alleged representations as to each of the other parcels].

"And the said plaintiff thereupon informed said defendant that if he purchased of him the said minutes and descriptions of land, it was for the purpose of purchasing the lands themselves of the United States and of the State of Michigan, according as he might ascertain which of said governments owned the same, and by reason of their value on account of the timber growing thereon that would make such land valuable and profitable for lumbering purposes, and by reason of their value for farming purposes after all the timber fit for good lumber has been cut off of the same, and having never seen said lands, or any of the same, he should rely upon the promises and upon the representations and undertakings of the said defendant concerning the same hereinbefore set forth. And the said defendant so being informed by the said plaintiff, did at Ionia aforesaid, on or about the 1st day of May aforesaid, sell the said plaintiff each and every of the said descriptions of land for the purposes aforesaid, and at the special instances and request

the said plaintiff then paid him therefor the sum of one hundred dollars for each description of eighty acres of land, making in all the sum of nine hundred and fifty dollars, relying upon the promises, undertakings and representations of him, the said defendant, of and concerning the said lands and their quality and of and concerning the quality and quantity of timber growing thereon as aforesaid.

"And the said plaintiff further avers that afterwards, to-wit: on or about the 9th day of May, 1872, and relying upon the said promises and undertakings of the said defendant, he, the said plaintiff, at great expense, purchased [the said lands of the United States and of the State of Michigan, paying therefor sums of money which are specified; that he has ever since been owner thereof and paid out large sums in taxes and] in ascertaining in fact the quality and quantity of said lands, and of each and every parcel thereof, and the quality and value of the timber growing thereon. And although he in all respects kept and performed his agreements with said defendant, and paid him the said sum of nine hundred and fifty dollars for the said minutes and descriptions of land, yet the said plaintiff in fact alleges that the said lands were not of the quality, and did not then have growing thereon, nor on any of the said descriptions thereof, pine trees or hemlock, either of the quantity or quality so promised and represented by the said defendant to the said plaintiff as hereinbefore set forth, but on the contrary thereof the said land had no such timber growing thereon and was not of the quality so promised by the said defendant, and was of no value whatever either for farming purposes, or for any of the purposes for which the said plaintiff purchased the said minutes of said defendant, and said lands aforesaid whereby said plaintiff hath suffered great damages, to-wit: the sum of six thousand dollars."

The theory of this count, as we understand it, is that Page, having special knowledge regarding certain parcels of government lands which would be valuable to persons contemplating the purchase thereof, was engaged in the business of selling descriptions thereof, as one might sell a valuable secret as property, and that in the course of that business he sold to the plaintiff his knowledge of the several parcels of land which the plaintiff subsequently purchased, giving a particular description of the important features of each parcel, and warranting his description to be correct. It is

material now to inquire how far this theory is sustained by the evidence.

The plaintiff was a witness on his own behalf, and testified as follows:

"Page, the defendant, has been engaged in land-looking for some 20 years past, and has been in the habit of looking up pine lands and furnishing 'minutes' thereof. Witness had conversation with Page some time in the winter of 1872. "I told him when he went into the woods again I wanted him to look me up some good pine lands, and I would pay him for it. He always said: 'Why, Judge, I know just what you want, and I can give you what you want.' Had several conversations about it. He said he would give me first refusal of minutes of good pine lands. Sometime in the spring he went into the woods; and shortly after that he wrote or telegraphed me that he had some 'minutes.' No particular price was agreed upon for the minutes. I was to pay what the minutes were worth after he returned from the woods. The land he gave me minutes of and which I bought are in Mason county, towns 19 N., 17 and 18 W., this State. I told Page I thought it strange that Mears and others hadn't taken these lands. Page said purchasers sometimes go around good pieces of pine land. After Page came back to Ionia I told him I wanted the estimates of the land, and Page read them from his minutes; he said they were minutes of good pine land, and I set down on each description of land the quality and quantity of pine and other timber, and of the kind of soil. [Witness here produced a paper, and said] I hold in my hand the minutes of each description as noted down by me and signed by the defendant. [This paper was marked *Exhibit A.*] Page went into the woods and the understanding was that he would give me some minutes of good pine lands. I received a letter or telegram telling me to locate the lands described in 'Exhibit A.' I did so. I located all these lands under this arrangement. After I located the lands I had him make these minutes (Ex. A). I bought the lands on the strength of his agreement to furnish me with descriptions of good pine lands, that he would give me minutes of good pine land."

Cross-examination: "In 1872 I told Page to look up some good pine lands for me, and he told me he could give me just what I wanted. While he was in the woods he wrote or telegraphed me giving me the descriptions, and I went and located the lands. The minutes were made after he came out of the woods. Paid him between $513 and

$525.    There was no special agreement as to the price:
was to pay what they were worth.    'Exhibit A' and the
representations therein were made after the locating of the
lands by me.    The letter or telegram directed me to locate
certain lands immediately, describing them,—the lands de-
scribed in 'Exhibit A.'    There was probably nothing in the
letter or telegram said about quality or quantity of pine.''

We have been particular to set out the declaration and
the plaintiff's statement of his case very fully, because the
case is quite peculiar, and we have not been able to take the
same view of the facts that was taken by the court below,
and that is insisted upon here.    The plaintiff regards the
transaction as in the nature of a sale of a chattel, and
insists that it is to be governed by the rules regarding the
sale of personalty.    The argument in substance is that de-
fendant had a property in his superior information respect-
ing the lands and his skill in judging of their value; that
he embodied these in the descriptions which he sold, and that
he might and did warrant the truth of these—in which their
value consisted—as he might warrant the soundness of a horse
or the validity of a title.    This we think is a fair state-
ment of the plaintiff's position, though it is stated in our
own language and with brevity.

Had it appeared that the defendant was possessed of this
information, and had made up his descriptions previous to
the bargain between these parties, and that under such cir-
cumstances he assumed to sell his special information, the
case would be so far different from the present that possibly
different principles might apply.    It might then be argued,
with some force, that the case resembled the sale of a valua-
ble secret, and that the rules governing the sales of per-
sonalty were applicable.    But this was no such case.    Here
the arrangement was for the future acquisition by the de-
fendant of information for the plaintiff's benefit, and for
the report of this to the plaintiff.    It is impossible, as we
think, to treat it as any thing but an employment.    It was
no more a sale of descriptions than is it a sale of opinions
when a lawyer is employed to examine a case and report
his views, or a physician to diagnose a case of disease.    In
one sense there is a sale in all such cases, but the law treats

it as an employment and the rendering of services in pursuance thereof.

Nor in any such case can there be any implied warranty of the absolute truth of the description given. Whoever bargains to render services for another undertakes for good faith and integrity, but he does not agree that he will commit no errors. For negligence, bad faith or dishonesty he would be liable to his employer; but if he is guilty of neither of these, the master or employer must submit to such incidental losses as may occur in the course of the employment, because these are incident to all avocations, and no one, by any implication of law, ever undertakes to protect another against them. A positive affirmation of the quality of lands as of one's personal knowledge when he has no knowledge on the subject, whereby his employer is misled and injured, should certainly render the person making it liable, either on the ground of bad faith or of negligence; but it could not be treated as a warranty of the quality of information sold.

We think also that the court erred in its view regarding the proper rule of damages. The defendant was to supply information upon which the plaintiff proposed to purchase lands. The information embraced the amount and quality of valuable timber, the nature of the soil, etc. If the plaintiff was induced to purchase lands on representations which proved to be untrue, the measure of his loss, as it seems to us, would be perfectly plain, and would be reached by an answer to the following question: How much less is the land worth as it is, than it would have been if its condition and quality had been as represented? This is the only safe and only reasonable rule: to permit the damage to be measured by the stumpage of timber would be to introduce speculative and uncertain questions, and lead to great injustice. It can seldom or never be affirmed that the market value of a piece of land, worthless except for its timber, is equal to the aggregate of estimated stumpage value of the individual trees growing upon it. But if timber lands may be judged in this way, other lands may be estimated by computing the value of the several constituents of value

separately and aggregating the whole: we may say, a thousand timber trees upon it are worth so much, a hill of gravel so much, a deposit of valuable clay so much, and when these are all removed the land is still worth so much for agricultural purposes; consequently, as it is, it is worth the aggregate of all these sums.    But such an estimate of value is unfair and misleading, and it takes us away from the exact question, which is, what is the market value of the land as it is?    Witnesses may of course take everything which goes to make up value into account, but in their estimate they must give their opinion of the market value of the whole, and not of its several parts.

The judgment must be reversed, with costs, and a new trial ordered.

The other Justices concurred.