WILLIAM WOOD et al.

*v.*

SPENCER M. ALPAUGH et al.

Defendants agreed, in writing, to pay to each of complainants a salary of $3,000 per year, and also ten per cent. of their annual profits, which percentage they guaranteed should not be less than $2,000. Complainants were to have exclusive charge and control of the·manufacture and decoration of all the wares in defendants' pottery for three years and two months. They entered into the service, and were discharged at the end of three years, all their salaries having been paid, and credit given each of them on the books of account for $4,000 during the first two years of their service. *Held*, that, there being no deception or mistake shown in the agreement, nor any subsequent modification, complainants are entitled to an account of the profits of the concern during their employment; that their inability to produce certain novel wares, which were experiments undertaken and continued with defendants' knowledge and consent, is no bar, because they have, admittedly, made a large quantity of other wares successfully; that complainants are not responsible for losses or damages, if any, attributable to causes beyond ordinary care, skill and workmanship; but, even if they were responsible therefor, such damage can not be recouped in this suit; that the defendants are estopped by their circulars and letters to their customers and agents, extolling the wares made by complainants, from now asserting their incompetency or negligence.

On bill, answer, and proofs.

*Mr. James S. Aitken*, for complainants.

*Mr. G. D. W. Vroom* and *Mr. B. Gummere*, for defendants.

BIRD, V. C.

The complainants ask that the defendants may be ordered to account to them for services rendered under an agreement. On the 7th day of May, 1883, the complainants and defendants entered into a written agreement, in and by which it was recited that the said defendants owned and operated a pottery manufactory in the city of Trenton, and that they had agreed to employ the said complainants to superintend and manage the manufactur-

ing part of the business, including the decorating department, and taking the entire charge of the works, the employment of hands and the selection of materials, after which recital it was agreed between the said parties that the said defendants should employ the complainants to take such entire charge and management of the manufacturing department of their pottery, including the decorating department, for the term of three years and two months from the date of said agreement; and the complainants agreed to enter into the employment of the said defendants, and to take the entire charge of the manufacturing department of said pottery, and to give their whole time, labor and skill towards the proper management of the said business during said term; and the said defendants further agreed that they would pay for said services during the said period a salary of $3,000 a year to each of the complainants, in weekly payments, and also ten per cent. of the profits of the business, which profits they guaranteed should produce to the said complainants at least the sum of $2,000 a year each. Under this agreement the complainants took charge of the works of the defendants. They say in their bill that they were practical operators in pottery work. They continued in the employ of the defendants until they were discharged in the month of March, 1885. Their salary of $3,000 a year was all paid, except a very small amount, but nothing additional—no part of the profits which, it is alleged, were made, has been paid. They say they are ignorant of the accounts of the business, and pray that an accounting may be ordered.

The defendants admit the agreement and that the complainants entered into their employ thereunder, and continued therein until they were discharged in March, 1885, just prior to the time when the agreement would have expired by its own limitation. They insist that there is nothing due the complainants, because of their unskillful management of the business which was committed to their charge under and by virtue of the agreement. They say that they had no practical knowledge themselves of the manufacture of pottery, and relied upon the complainants, but that they so unfaithfully performed their duties that great loss resulted to the defendants.

Ought there be an accounting, and whether an accounting or not, ought the defendants to be charged with the $2,000 profits which they guaranteed to the complainants? The accounting is resisted by the defendants on the ground of unskillful management of their pottery by the complainants. It is alleged that, because of such unskillful management, they suffered great loss, and that no profits were made. It is undoubtedly true that certain portions of the work undertaken by the complainants were failures. They undertook to manufacture what was called bone china, imperial china, vitrified china, and underglazed decorated ware, and all proved failures except perhaps the imperial china, of which more hereafter. The responsibility for these undertakings and for the failures is all charged by the defendants upon the complainants. It is insisted that the complainants represented themselves as able to make the manufacture of these various wares a complete success, and that they, in so many words, guaranteed the defendants that such should be the result of the undertaking. Upon such representations, the defendants, permitted the complainants to proceed to make the necessary purchases of the materials and to construct the proper works, and they also advertised such wares, upon the belief that the effort would be successful, and received large orders from Boston, from Chicago and from Pittsburgh and other places, amounting in all to many thousands of dollars; and that a short time after the orders were filled, complaints were made and the goods returned, either to the entire loss of the defendants, or nearly so. In some instances they were permitted to supply the orders with other goods. It is proper to state that the goods enumerated were not all the goods that were manufactured; they also manufactured, at the same establishment, a very large amount of plain white ware, amounting in all to about $200,000 worth each year, yet in fact the insistment is, upon the part of the defendants, that no profits resulted to them from the manufacture of wares as a whole.

Taking these statements, and giving the defendants the full benefit of it, the question still arises, Under the circumstances of this case, are the complainants entitled to an accounting in order

to ascertain whether any profits accrued in this business during the continuance of their services, of which they are entitled to a share? Now, it is to be observed, that one of the defendants, Mr. Magowan, was not entirely ignorant of the manufacture of pottery ware. He was inquired of whether he could say of his own knowledge what the quality of certain wares was. He said that he could, and that he was well acquainted with several recipes for manufacturing pottery, and that he had given a great deal of time and attention to it. Answering further upon the subject, he said that he was thoroughly acquainted with it, so much so that, in speaking of the result of the experiment of manufacturing imperial china, he said that it was very bad indeed. It is important to bear this fact in mind. It is entitled, together with other circumstances, to great weight in the further consideration of the question now before me. Mr. Magowan describes the imperfections of the wares that were produced; specifically characterizes the different defects and the consequences of those defects to the firm. He also tells what produced the defects. He says that they were caused by bad management in and about the kilns, and by a lack of attention to the placing of saggers and keeping the saggers in proper condition, so that when the ware was being fired, the dirt would fall upon the ware and become mixed with it. It appears, from Mr. Magowan's testimony, that he knew of this unskillful management and of these imperfect wares from the first, and that during the first six months of their employment he frequently called the attention of the complainants to them and to the great loss which they, Alpaugh & Magowan, were sustaining by such management. According to Mr. Magowan's testimony, so seriously was he impressed with the failure of these complainants to accomplish what the defendants expected of them, that they early contemplated discharging them, and would have done so had it not been for the difficulty of getting any one else to take hold of the work and to carry it on for them. It should be noted, in this connection, that the defendants had every opportunity to know that this peculiar kind of wares, which were called specialties, was not manufactured so as to be acceptable

Wood *v.* Alpaugh.

to their customers, and that the experiments which they rely on as a bar to an accounting were failures.

This view of the case is enforced by the consideration that every one of these undertakings to manufacture the specialties above named, was an experiment. The testimony makes it perfectly clear that the defendants so understood it. It cannot be said, therefore, that the entire responsibility for the undertaking rested with the complainants, and that the consequences should be visited upon them alone. As intimated, within six months after complainants' employment, an experiment was tried which proved a failure. The defendants were fully apprised of it by the ill success with which the wares met when put upon the market, and by the fact that large numbers of them were returned by their customers. They spoke to the complainants about the misfortune in that particular. The complainants acknowledged that they had made a mistake, that the effort was not a success, but the defendants allowed them to go on and to make other experiments in other specialties from time to time, each one, as has been said, being fruitless. The complainants, it is true, were representing themselves to the defendants as expert manufacturers of pottery, and as able to manage the large concern of the defendants with success, but, at the same time, they had in the course of their employment demonstrated their inability to manufacture the specialties which the defendants thought were so desirable. After this demonstration the defendants had no right to go further. It seems to me, upon the plainest principles, that they, being the owners of the establishment, not only had the right, but it was their duty, to prevent any further experiments, unless they were willing to experiment at their own cost. It seems to me that it would be a strange doctrine if servants or employees, whether skilled or unskilled, should be held responsible, without special agreement, for every effort made by them, by way of change or otherwise, to advance the interests of their masters or their employers; and especially does this seem to be the proper view when such change or effort is made with the full knowledge and consent of the master or employer. No steps were taken in these experiments without the defendants'

Wood v. Alpaugh.

knowledge. They were first consulted with, and in every instance, if they did not advise and order the experiment, they consented thereto. I think it may be safely said that they not only approved of complainants' undertaking, but were anxious that it should be made.

They no doubt had great confidence in success, for they required great speed in the work, and they advertised their specialties very extensively, long before any goods had actually been produced from the kilns, and solicited orders before there was any demonstration whatever that the success would be complete. These views are strengthened by the facts which will appear in the consideration of the liability of Alpaugh & Magowan on their guarantee of profits to the extent of at least $2,000 to Wood and Barlow, which question we will now consider.

Are Alpaugh & Magowan liable on their guarantee to Wood and Barlow that each one's share of the profits should amount to at least $2,000 a year? The language of the agreement, respecting this, is in these words:

"And the said party of the first part do agree that the said parties of the second part shall receive for their said services during the said period the salary of $3,000 a year each, payable in weekly payments. And do further agree that said Wood and Barlow shall also have and be entitled to ten per cent. of the net profits of said business during said period. And said party of the first part do guarantee that said profits shall bring in to said party of the second part a sum of at least $2,000 a year to each of them, and said salary and profits to begin on the 21st day of May, 1883."

This is the contract, respecting salary and profits, put in writing by the parties. It is as plain and exact as words can make it, and without polish or circumlocution. Its meaning is as certain as the language is plain. There is no possible ground for doubt because of ambiguous words or phrases, or of conflict between different sentences. Alpaugh & Magowan guaranteed that said profits should bring in to Wood and Barlow a salary of at least $2,000 a year to each of them. If any part of the contract is binding upon either of the parties thereto, this certainly is. Under every rule of law this written agreement must pre-

vail, unless it was procured by fraud, or unless there was a mistake made in the insertion of it, or unless it has been varied subsequently by another agreement, or unless Wood and Barlow have been guilty of gross neglect or inefficiency in the discharge of their duties as managers; guilty of neglect or inefficiency of their duty arising out of the written contract.

I cannot find that there was any fraud in the conception of the contract, or in its execution. This particular clause arrested the attention of Alpaugh when it was first read in his hearing, and its object and purport were then considered and discussed in the presence of all the parties thereto, and, after a clear understanding respecting it, the instrument was signed. And, when the circumstances which led to the execution of this contract are presented and considered, it will be seen that Wood and Barlow neither said nor did anything by which Alpaugh & Magowan could have been misled, or were in any respect deceived.

Barlow had been living in Trenton for years, and had the reputation of being a good, practical potter. He had been in the employ of other companies in Trenton, and was, as far as appears, a skillful worker. For some time before his engagement with Alpaugh & Magowan he had been in the employ of Mr. James Moses. At the time of this contract he was still in the employ of Mr. Moses, under a contract to work for him for five years, two years of which had yet to run. Mr. Moses was a skillful and successful potter, and Barlow had the reputation of being an efficient helper to him.

Alpaugh & Magowan had recently purchased the potteries which they were at this time operating, and they desired additional help in the management of them. Magowan had learned of the abilities of Barlow as a practical potter. He sought an interview with Barlow. Through a friend he arranged for a meeting. At this first interview Magowan offered Barlow $30 per week and ten per cent. of the profits of the business. Barlow refused the offer, and gave as a reason his engagement with Mr. Moses, explaining to Magowan that he was under obligation to him for two years to come. Magowan asked Barlow to procure a release from Mr. Moses, which Barlow endeavored to do, but

which Mr. Moses refused. The next day Magowan saw Barlow, and learned the fact that Mr. Moses refused to release him. But Magowan again pressed Barlow to procure a release, and still Barlow was unsuccessful with Mr. Moses. Magowan then offered $60 a week and ten per cent. of the profits. Barlow made further efforts with Mr. Moses for a release, but Mr. Moses told him that if he left his employ he would prosecute him ; and this fact Barlow communicated to Magowan, and Magowan told Barlow that he would guarantee to protect him against any action for damages brought by Mr. Moses. Barlow still refused to engage with him. Magowan then called in the aid of Wood, one of the complainants, who is a brother-in-law to Barlow, and also a practical potter. Wood called on Barlow, at the request of Magowan, and told Barlow that Magowan had offered him $60 a week, and also ten per cent. of the profits, and was willing to guarantee that the profits should amount to at least $2,000 a year, and that he had authorized him to say that he would give the same to Barlow. After this interview, a meeting of Magowan, Barlow and Wood was arranged for, on the following Sunday, at the house of Wood. They had such meeting on the Sunday named, and Magowan assured Wood and Barlow that he would give them the sum of $60 per week each, and would guarantee to them that their share of the profits should be at least $2,000 a year each. At that meeting Magowan also promised to indemnify Barlow against any action which Mr. Moses might bring against him for a breach of his contract, and a willingness to express it in writing. Barlow then promised to enter into the employ of Alpaugh & Magowan. It was understood that Wood and Barlow should have the agreement prepared in accordance with the terms then stipulated, and it was accordingly prepared and signed as above indicated, and so also was the agreement to indemnify Barlow against all costs and damages in any action by Mr. Moses. As I have intimated, when the agreement was read previous to the signing, Alpaugh expressed some surprise at the clause guaranteeing that the profits should amount to $2,000 a year to each of the complainants ; but the matter was discussed, and the agreement was signed by the parties with that clause un-

changed. It is an important fact that the attention of the parties was particularly called to this branch of the contract. It shows, beyond qualification, that it was regarded as important by all the parties thereto ; so important that the complainants were careful to have it inserted in the plainest terms in the agreement, and that Alpaugh, who had taken no great part in the negotiations, should speak of it when the agreement was first read.

From this brief narration it is very evident that Magowan was extremely anxious to secure the services of Wood and Barlow, and this accounts, in a great part, for the guarantee clause in the contract that the share of the profits to Wood and Barlow should be at least $2,000 a year for each. It is of great consequence to consider that Magowan was so unceasing in his efforts, so unchanging in his desire to have Wood and Barlow enter into his services, that he was not only willing to pay an extraordinary salary for their services by the week, and to guarantee them two-thirds as much more at the end of each year, with a flattering prospect of an additional amount by way of profits, but was also willing to agree to indemnify Barlow against all the costs and expenses that might result to him from the breach of his contract with Mr. Moses. There is nothing in the case that leads me to the slightest conviction that there was any fraud or any misunderstanding whatever between these parties prior to or at the time of the execution of this agreement. I am satisfied that the complainants were what they were understood to be— good, practical potters. I am satisfied that they held out no inducements to either Alpaugh or Magowan that they were anything else. Whatever either of the defendants may have imagined or supposed, there is nothing in the case to have justified them in believing that either Wood or Barlow was greatly skilled beyond their fellows in the art in which they were engaged. Taking the case as it stands, considering the circumstances of the parties, the knowledge which Alpaugh & Magowan had of the business, and the undoubted opportunities which they had to know of the qualifications and experience of Wood and Barlow, they were not deceived or misled by either Wood or Barlow. I do not wish to be understood as saying that Alpaugh

& Magowan have not sworn that Wood and Barlow represented to them that they could manufacture certain kinds of ware which upon trial they did not succeed in doing. But whatever on this head has been asserted by Alpaugh & Magowan has been with equal emphasis denied by Wood and Barlow, not only by flat contradiction, but by circumstantial detail. This being so, and the burden being on the defendants, the well-established rule requiring a preponderance of evidence before judgment, I cannot conclude in favor of Alpaugh & Magowan on this branch of the case.

And, on this same point, consider the fact that Alpaugh & Magowan had become leading pottery manufacturers in Trenton, and had, for some time, an abundant opportunity of becoming acquainted with the skilled potters, and did inquire respecting the abilities of Wood and Barlow, and did learn beyond question the exact position which they occupied as artisans. Both Wood and Barlow had been for years employed in the trade in Trenton. Both of them, as far as appears, had been successful; and yet neither of them possessed all the secrets of the trade, nor the ability, either from experience or education, of manufacturing every kind of ware known to the trade. This shows the situation of the parties, the opportunities which Alpaugh & Magowan had for acquiring information, and the knowledge which they must have had respecting the ability of these complainants when these negotiations were commenced and concluded. And the truth of these observations is established, to my mind, beyond question, when it is considered that Magowan pressed his suit with such pertinacity as to induce Barlow to leave Mr. Moses, and at the same time to offer him, by way of guarantee, $2,000 a year out of the profits. And again, how can I conclude that Wood and Barlow were not, in truth, good, practical potters, when it is established that under their management about $200,000 worth of wares was manufactured at the defendants' works each year, not taking into the account the experiments referred to?

There was no mistake in the execution of the agreement. It undoubtedly expressed the offer of Magowan, and the terms on which Wood and Barlow consented to enter into the employ of

Alpaugh & Magowan. That the agreement itself is free from any such charge, is manifest from the fact that no effort has been made at reformation. Nor can I find that there was any change in this contract, either verbal or written, after its execution. There is nothing which shows the slightest intention of the parties to make any modification of it. Whatever rights accrued or obligations were incurred, they were independent of the original written contract, and, if any were, must be considered separately from it. After the fullest investigation, I can lay hold of nothing that will justify me in holding that such rights or obligations hinge upon the written contract. If there should be found any such rights or obligations to exist, another question arises. In such case, should Alpaugh & Magowan show an equitable claim, could it be set off, or could there be recoupment? Under the practice in this court, I think not. This, I think, is established on the firmest footing by the case of *Trotter* v. *Hecksher*, *13 Stew. Eq. 612.*

The merits of this branch of the case, resting upon the facts as detailed by the witnesses, I will now proceed to look into, going upon the ground of total failure of consideration.

Alpaugh & Magowan insist that they are not bound to comply with the terms of the contract as to this guarantee of $2,000 a year to each of the complainants, because there were no profits, and because of the failure of Wood and Barlow to manage the manufacture of pottery successfully. The defendants insist that all depended upon the successful operation of the concern ; that the agreement had for its foundation the skill and ability of the complainants to manage the pottery with profit; that this consideration was the very life of the agreement itself. In one respect this is undoubtedly so ; and it may well be admitted that Alpaugh & Magowan would not have entered into an agreement to pay $5,000 a year to each of their managers, unless, to their own minds, at least, there were the best of assurances of large profits from the operation of their establishment. This is of great importance, and I have not overlooked it. But when the rights of the other contracting parties are considered, a different view is presented. As to them, it may well be inferred that, whether

30

there were profits or not, is not so much the question.   For, if
Alpaugh & Magowan can refuse to pay the $2,000 (which, it is
said, they guaranteed to pay) because there were no profits, just
as well might they refuse to pay any part of the compensation
of $60 a week for services.   The defendants were under just as
much obligation to pay the one as the other, and could as well
be relieved from the one as from the other ; the same reasoning
which would excuse payment in the one case would in the other ;
both are alike binding by way of contract.   In one case it is an
agreement to pay $60 a week, and in the other $2,000 a year,
the only difference being in the language used to express the ob-
ligation.   The one is a simple promise, the other is enforced by
the stronger term, it may be, of the word " guarantee."   The
$2,000 offered out of the profits were just as much compensation
for labor and services as the $60 per week, and, if Wood and
Barlow failed to earn the one, because of negligence or unskill-
fulness, they certainly failed to earn the other.   The same rules
of law and the same reasoning must apply to both alike.

The question remains whether or not the defendants can escape
their obligation to pay the $2,000 a year profits, because of the
unskillful or negligent management of the potteries upon the
part of Wood and Barlow.   In determining this question, I
must consider the extent to which Alpaugh & Magowan desired
to apply this negligence and unskillfulness.   I have said that
the testimony satisfies me that Wood and Barlow were, in the
just sense of the term, good, practical potters.   I find nothing in
the case to satisfy me that, during their employment with Alpaugh
& Magowan, they did anything to falsify their reputation in this
respect.   Now, to what extent does Alpaugh & Magowan desire
to make application of their charge of complainants' inability
and mismanagement?   Is it to the whole of the business, to the
entire management, to all of the output of the plant, to every-
thing that was manufactured there and put upon the market?
No.   They only seek to charge Wood and Barlow with inabil-
ity, unskillfulness or mismanagement with respect to the vitri-
fied china, the bone china, the underglazed decorated ware, and
perhaps with portions of the imperial china.   When the contract

was made, none of these wares was made at the pottery of the defendants; other kinds of wares were made to a very large extent. As I have intimated, it is most clear that the vitrified china, the bone china and the underglazed decorated ware were not among the goods commonly manufactured in this country. The underglazed decorated ware was manufactured in Trenton, and it may be elsewhere in this country, and the manufacture of it at other places in Trenton had been made a success; but, from the testimony, I am led to believe that that success depended upon knowledge of some branch of the manufacture which was a secret; for one of the principal manufacturers of that ware was questioned upon that very point, and declined to give the secret, which he supposed he enjoyed, to the public. Now, therefore, admitting that with respect to these wares, Wood and Barlow did not succeed, should the defence so set up by Alpaugh & Magowan, with respect to the $2,000 a year, prevail? In other words, is the servant or employee, whatever his position may be, chargeable with the failure of every new enterprise which may be entered into, whether it be with his consent and approval, or even recommendation and assurance of success, or not? In my judgment, under the law, this question must be answered in the negative. I can discover no principle of law that binds a servant or employee to that which is equivalent to compensation in damages for the failure of any extraordinary undertaking, unless he has expressly bound himself thereto. Simple recommendation or assurance is not equivalent to a contract of indemnity. There seems to be nothing, anywhere in the law of contracts, that binds a servant to the consequences of the extraordinary undertakings which he is directed to engage in by his master or employer, however enthusiastic such servant may be in the expression of the belief or assurance that he can make it a success. I am speaking now with sole reference to the facts in the case before me. The undertakings to which my thoughts are directed are those which were peculiar, novel, extraordinary in themselves, and from which, if they had been successful, the defendants expected to reap prodigious profits. These peculiar wares were not made, when the contract

Wood v. Alpaugh.

was entered into, at this pottery. They afterwards were suggested, and whether by Wood and Barlow or not cannot be material. The manufacture of them was not undertaken until Alpaugh & Magowan had been fully consulted respecting it, and their judgment and approval given. Alpaugh & Magowan insist that Wood and Barlow in each instance guaranteed success, but this is unqualifiedly denied by Wood and Barlow. These contradictions, like many other absolute and direct contradictions in the case, I cannot reconcile; and I am free to say that there is nothing in the case which enables me to form a satisfactory conclusion that the complainants did, in any binding sense, assure the defendants that they could make the specialties above named. I desire to say, however, that it is clear to a demonstration, that when the defendants engaged the complainants to manage their pottery, the defendants were full of hope and enthusiasm and expected large rewards for their undertaking, profits amounting to $50,000 or $60,000 each year, and were thus induced to offer the salaries for the services of the complainants which they afterwards found a burden, and which they now seek to rid themselves of; and I am equally well satisfied that the complainants, elated with the flattering offers which had been held out to them by the defendants, and which had been guaranteed to them by the agreement, undertook the work of managing these potteries with a like enthusiasm, and were encouraged thereby to make every effort to please their employers and thereby reward themselves by greatly increasing the profits of the concern. But the very first efforts at the manufacture of specialties were unsuccessful. As above said, before six months had elapsed this was demonstrated to both Alpaugh and Magowan. Yet, in the face of this warning, they continued, or allowed their managers, Wood and Barlow, to continue, their experiments, now in one direction and now in another; at one time, with vitrified china; at another, with bone china; and not only allowed, but urged them on in this new work. It is not said that Alpaugh & Magowan were absolutely ignorant of the qualities of these wares. They could not mould or fashion them; they did not know how to glaze or temper them; they did not know

Wood *v.* Alpaugh.

how to burn, or when to draw, the kiln, but they certainly had such a practical knowledge of the quality of the wares as to be able to determine very good from very poor, and to draw some conclusions in a business way, at least, from those efforts which they themselves now say were total failures. Alpaugh had been engaged as a pottery salesman for at least seven years, and in that respect, amongst pottery men, had earned a very good reputation; with this experience must have come an extensive acquaintance with the quality of the goods which he was engaged in vending, though he could not make them. Magowan declares that he had such knowledge of the different kinds of wares, and had the recipes for the manufacture of them. It would be quite absurd, therefore, for the court to proceed, in the consideration of this question, upon the ground that Alpaugh & Magowan were wholly ignorant of the art, and that they were relying solely on the judgment and skill of Wood and Barlow.

The propriety, applicability and importance of the foregoing remarks will be more and more manifest as a few of the well-considered acts of Alpaugh & Magowan are taken into the account. The speech and conduct of the parties during the ordinary progress of events which they are interested in, and have the control of, are of infinitely more value in ascertaining the truth than what may be insisted upon by them as conclusions of fact in the midst of an excited, legal controversy. From this standpoint I think the evidence shows, beyond the possibility of refutation, that Wood and Barlow were good, practical potters, and that they proved themselves so to be while in the employ of Alpaugh & Magowan. I now submit what I refer to.

On July 25th, 1884 (more than a year after the contract had been signed), Magowan wrote to one of defendants' agents in Detroit, saying:

"I am pleased to learn you sold several bills in Cleveland, and hope you will succeed in making sales to new trade for our light imperial china; for, as you are aware, these are the goods, and the only goods, we propose making or selling. We do not care to have sales for granite or C. C. goods pushed at all. Make as many sample sales of hotel china as possible, for we are confident wherever these goods get into the hands of first-class houses, they will appre-

ciate the quality, workmanship &c., and favor us with a continuance of their trade."

On August 11th, 1884, Alpaugh & Magowan wrote to the same agent, saying :

" We beg leave to inform you that, at a meeting of the firm yesterday, it was decided to discontinue the manufacture of white granite and C. C. ware, and to devote our entire attention to the production of imperial china. * * * In accordance with our instructions, you will, therefore, push the sale of imperial china, and secure all the orders you can."

In April, 1885 (after Wood and Barlow had been in their employ nearly two years under the contract), Alpaugh & Magowan issued to the trade a circular, in which they say :

" Notwithstanding the enormous productive facilities of this pottery, we have been obliged to discontinue the manufacture of white granite and C. C. ware, and to confine ourselves exclusively to the production of our present leader, a high grade of extra quality, plain and decorated, thin porcelain dinner, tea and toilet ware, which we have named imperial china. We claim for this imperial china a quality, durability and finish that is unrivaled. It is superior to any thin porcelain made in America, and fully equal in every respect to foreign importation—we make no exception. Our shapes and decorations have been conceded, by those who have made a comparison, to be the most perfect ever placed upon the market. For beauty, symmetry and utility, they are without a rival. * * * All we ask, to prove the accuracy of these claims, is a competitive test. We are the only manufacturers in this country who back their goods with a warranty. We enclose a copy of this ironclad document, which speaks for itself."

In May, 1885, Alpaugh & Magowan issued another circular to the public, headed " Victory," in which they use the following language respecting the production of their works and of their managers, Wood and Barlow, who had now been in their employ for two years :

" American sanitary earthen ware, not only equal but superior to any of foreign manufacture, now being produced in the Empire pottery. Competitive tests by the most prominent and practical experts of this country has verified this claim. The delusive arguments presented to the trade by certain inspectors of sanitary ware, who are interested in foreign potteries, should no

longer be entertained by jobbers or dealers, for in America we not only have the finest clays and crude materials ever discovered, but the Empire pottery has the same practical managers and the same experienced workmen who have been prominently identified with the largest and most prominent English sanitary ware potteries from boyhood, and bring to us the benefit of their long and valuable experience."

In another circular they say to the public :

" Recollect, we are the only manufacturers who have proved by actual test that our ware is the best, both in quality, durability and finish."

And as late as November 5th, 1885, only a short time before complainants were discharged, in a circular concerning the management of the pottery, directed to Wood, Alpaugh & Magowan say :

" The good workmanship of the ware is to be maintained."

Certainly these defendants, Alpaugh & Magowan, are too high-minded, honest and honorable to expect or think that any court would announce a decree which would be equivalent to convicting them of willful misrepresentation in every one of the utterances by them above quoted. Interest, duty, honor required them to speak the truth then, and I feel it to be my duty to take them at their word.

But it may be asked if these defendants, Alpaugh & Magowan, be honest and honorable men, having made the foregoing statements and given them to the public, to induce merchants to buy of them, how do they excuse this resistance to the claims of Wood and Barlow under the contract? I have answered this question above, but renew the inquiry, so that the exact point of conflict may not be lost sight of. The answer to the inquiry is (though not so expressed in the pleadings, nor by any admission direct and open), that, notwithstanding all that was said in the circulars, the bone china, the vitrified china and the underglazed decorated ware were failures, and because they were such failures, the complainants, Wood and Barlow, have forfeited all right to the $2,000 each for each year during their service.

Wood *v.* Alpaugh.

I have endeavored to show that this contention cannot control. The quotations from the pen of Alpaugh & Magowan, given above, are irrefutable proofs that Wood and Barlow are good, practical potters, and that they did for Alpaugh & Magowan all the law required of them under the contract. In such case it is the duty of the employed to perform the duties incident to his employment, honestly, with ordinary care, and with due regard to his employer's interest and business; and it is implied that he is competent to discharge the duties for which he is employed, and that he possesses the requisite skill. *Wood on Mas. & Serv.* §§ *83, 157; Parker* v. *Platt, 74 Ill. 430; Waugh* v. *Shunk, 20 Pa. St. 130; Page* v. *Wells, 37 Mich. 415, 421.* In this last case, Cooley, C. J., says: "Whoever bargains to render services for another undertakes for good faith and integrity, but he does not agree that he will commit no errors. For negligence, bad faith or dishonesty, he would be liable to his employer; but if he is guilty of neither of these, the master or employer must submit to such incidental losses as may occur in the course of the employment, because these are incident to all avocations, and no one, by any implication of law, ever undertakes to protect another against them."

I will only submit one other fact, which, I think, will immovably stand against the contention of the defendants, and that is, that, in 1884 (after Wood and Barlow had been managing for more than a year), Alpaugh & Magowan gave Wood and Barlow credit for the $2,000, and handed a statement to each to that effect. And in 1885, September 22d, Alpaugh & Magowan directed a like credit to be given to each of them and a statement to each with a credit of $4,000.

I will advise a decree in accordance with these views. The complainants are entitled to costs.