BRYAN v. HOUSEMAN-SPITZLEY CORPORATION.

1. FRAUD—REPRESENTATIONS NOT MERGED IN THE WRITTEN CONTRACT—EVIDENCE—ADMISSIBILITY.

In an action to recover damages for alleged fraud and deceit by which plaintiff was induced to enter into a written contract for the purchase of a house and lot, evidence of such misrepresentations not merged in the contract was admissible for the purpose of establishing the charged fraud.

2. SAME—RIGHT TO SUE WITHOUT RESCISSION.

Under his claim of fraudulent representations, it was plaintiff's right to sue either with or without rescission.

3. SAME—TRIAL—CONDUCT OF COURT.

That plaintiff chose to retain the property he had bought
for a home, continue in possession and sue for damages
because of false representations as to its condition, was
not a proper subject of criticism by the court.

4. SAME—DAMAGES—MEASURE OF DAMAGES.

Where plaintiff retains the property purchased and sues for
damages because of false representations as to its condi-
tion, the general rule of damages in such case is the dif-
ference between the value of the property as it actually
was at the time of the purchase and what its value would
have been had quality and condition been as represented.

5. SAME—TRIAL—CONDUCT OF COURT—REVERSIBLE ERROR.

Comments of the trial judge, containing inapplicable asser-
tions of legal import and statements of fact outside the
evidence, belittling plaintiff's claim, made in the presence
of the jury after counsel had requested that they be ex-
cused while the legal questions were discussed, and which
were reflected in the verdict, *held*, reversible error.

6. TRIAL—INSTRUCTIONS—ISSUES PRESENTED.

Where plaintiff offered testimony to prove his claim that
the boiler and radiators were insufficient, and that it was
improperly installed to adequately heat the house, the
trial judge was in error in confining his instructions to
the jury to the boiler and ignoring the issues of proper
installation and sufficient radiation.

7. APPEAL AND ERROR—INSUFFICIENT VERDICT—NEW TRIAL.

Where the verdict for plaintiff was illogical in amount,
under the evidence, if defendant was liable at all, evi-
dencing that the errors are reflected in the verdict, the
judgment will be set aside and a new trial granted.

Error to Wayne; Mandell (Henry A.), J. Sub-
mitted January 4, 1921. (Docket No. 10.) Decided
March 30, 1921.

Case in justice's court by F. Irwin Bryan against
the Houseman-Spitzley Corporation for fraud and de-
ceit in the sale of a house. There was judgment for
plaintiff, and defendant appealed to the circuit court.

Judgment for plaintiff for an inadequate amount. He brings error. Reversed.

*Harry J. Lippman,* for appellant.

*Goodenough, Voorhies & Long,* for appellee.

STEERE, C. J. This action was brought to recover damages for fraud, deceit and false representations in the sale by defendant to plaintiff of a house and lot in the city of Detroit under a contract providing for payments of $300 down and the balance in monthly instalments of $35 each, the purchase price being $4,500.

In the year 1917 defendant owned a number of lots located on Carson, Longworth and Falcon avenues in the city of Detroit upon which it engaged in quantity production for market of standardized duplex houses and bungalows. During that season it built 38 duplex houses and 42 bungalows on said lots. The bungalows were constructed from one set of plans of uniform size and identical as to interior arrangement and equipment, but with some exterior variations in dormers and porch design to alter outside appearances. Each of the bungalows had five rooms and a basement, with customary equipment for modern conveniences installed, including boiler and radiators for heating. These, like the other modern improvements in the buildings, were of the same make, design and size. The lots thus improved were put upon the market by defendant through agents it employed and sold under contract or otherwise as purchasers were secured.

Defendant issued for sale purposes an attractive circular or folder illustrating and describing its duplex houses and bungalows. It contained a cut of a bungalow like that plaintiff purchased. Copies were supplied to defendant's sales agents for use in their work with prospective purchasers and one of them was given to plaintiff during negotiations for his purchase.

It described in laudatory terms defendant's "*West Side Homes.* Sold on easy terms—Reasonable prices." The various features of the buildings, emphasizing the modern conveniences, were described under separate headings, amongst which were "*Steam Heat*—Adequate sized boiler and surplus radiation. This system of heating is economical on coal consumption, free from dust, requires little attention." As more directly applicable to plaintiff's purchase, in another portion of the folder—apparently on the same page as the bungalow picture—appeared "*Steam Heat*—Complete, efficient, economical steam heating plant connected with boiler, also gas heater."

The land contract under which plaintiff held this property is of standard form. It describes the premises contracted for as "lot three hundred and nine (309) of the John P. Clark Estate subdivision of lot 8, Shipyard tract, village of Woodmere (now city of Detroit), more particularly known as 137 Falcon avenue." It contains customary provisions as to possession, time of payment, conveyance of good title on payment in full, etc., with tax and insurance clauses, requiring same to be paid by the purchaser. The only reference to any buildings appears in the insurance clause, which requires plaintiff to "keep the buildings and improvements upon and to be placed upon said premises" in good repair and insured for the benefit of the vendor until the purchase money is fully paid. It is dated October 4, 1917.

Plaintiff made his payment of $300 down and took possession of the premises soon after he entered into the contract. When weather conditions made it desirable he proceeded to use the heating plant in his bungalow, but as winter came on found it sadly inadequate to heat the house, as he claimed. He early consulted an expert upon heating, who pronounced both boiler capacity and radiation insufficient, then notified

defendant of the claimed inadequacy of the plant it had installed and of the increased capacity he claimed was required. This, as he testified, was during December, 1917.

On January 3, 1918, he again evidently made demand for prompt action with intimation his payments would be withheld in the meantime, as on January 7, 1918, defendant wrote him partly as follows:

"We received further notice, dated January 3d, signed by you, relative to any further payments on your land contract. * * * If you persist in the deferring of your monthly payments until this matter is straightened out, we can only inform you that we will act according to law in this matter and you will find that if we do so, we can either force you to make these payments promptly when due or foreclose on your equity."

The letter also gives assurances of defendant's responsibility "and purpose, if the heating plant is inefficient, to correct this defect." Nothing, however, was done by defendant at plaintiff's place until February 22, 1918, when it delivered another boiler there and proposed to install it.

In the meantime defendant had negotiated with the United States Heater Corporation from which the boilers already installed in the bungalows had been purchased and contracted for their exchange, at an additional cost of $24 each, for others of somewhat larger capacity, recommended as better adapted for available fuel. Several of the new boilers had already been installed and tried in other bungalows like plaintiff's before February 22d. He claimed they had neither been satisfactory nor proved adequate because of insufficient capacity to heat those homes, and were so pronounced by the expert he had consulted. Urging such reasons he refused to allow the boiler which defendant had delivered at his place to be installed and demanded one of the capacity he had been assured

was sufficient, offering in that connection, as he testifies, to pay the difference between the boiler which he desired and had learned was adequate and the one they proposed to put in. This, he stated, defendant agreed to, but "did not live up to that agreement," which was denied by Mr. Spitzley, the member of defendant to whom plaintiff said he made the proposal, who in direct contradiction said, "Mr. Bryan did not agree to pay the difference, personally, between the boiler we wanted to put in his house and the kind of boiler that he wanted put in." Their testimony is in marked contradiction as to what passed between them. So far as material, that issue and others raised by their conflicting testimony were for the jury.

Plaintiff himself took no steps to remedy the defects until the following spring and during the winter kept the original boiler in his home and used it. He tells a harrowing tale of his unsuccessful efforts to keep the house and family warm, and testifies to futile stoking of the furnace to the exhaustion of himself and his coal bin, which he replenished at great expense from time to time with soft coal, hard coal and coke.

Plaintiff's declaration alleges in part that defendant—

"wrongfully, deceitfully, fraudulently and falsely made unto the said plaintiff false and fraudulent statements concerning said premises as aforesaid, viz.: that said premises were in good and proper repair, properly tenantable and fit for a home; that said heating plant, radiation and equipment so installed in said premises were sufficient to adequately and properly heat, keep warm and comfortable said premises; this plaintiff having wholly relied thereupon and being induced thereby to enter into said contract as aforesaid with said defendant for the purchase of said premises aforesaid, he being deceived thereby."

The particulars in which he claimed to have sustained damages for which he sought to recover include

213—Mich.—16.

being "forced to live for a period of six months thereof" in his kitchen, to receive his guests there, subjecting him to "great hardships, sufferings and to indignity, humiliation, disgrace and great injury to his feelings," also for excessive expenditure in purchase of fuel in his futile efforts to keep the house warm during the winter, for injury to walls and decoration by moisture and frost while operating that plant, and for the cost of installing an adequate one.

The case was commenced in a justice's court of Wayne county where plaintiff obtained a judgment for $350, from which it was appealed to the circuit court and there exhaustively re-tried before a jury resulting in a verdict and judgment in plaintiff's favor for $34.80. Plaintiff then moved for a new trial on many grounds, among others, that the judgment was wholly inadequate, largely owing to expressions of opinion on the disputed facts by the court and rulings upon questions of law. The motion being denied without filing reasons as requested, he removed the case to this court by writ of error with a record containing 215 printed pages in which, under the doubtful theory that in a multitude of assignments of error there is wisdom, he assigns for review 76 particulars in which it is claimed the court committed error during the progress of the trial. The majority of these assignments are directed to a series of somewhat querulous and argumentative comments by the court which manifestly served no useful purpose in the case and might better have been omitted, but for the most part are not of such serious import as to demand detailed consideration. The record does, however, contain conflicting rulings upon the law and comments by the court in presence of the jury, particularly upon the question of damages, which we are constrained to conclude were confusing to the jury and prejudicially reflected in the verdict.

Plaintiff's action was planted on fraudulent mis-

representations as to facts, of which he was ignorant and upon which he relied, not merged in the written contract and by which he was induced to purchase the property. The rule is elementary that if misrepresentations of material facts are made to induce the contract and they so result, evidence of such misrepresentations may be given for the purpose of establishing the charged fraud.

At commencement of the trial, after describing the property and testifying he had purchased it of defendant, plaintiff stated his negotiations were with a man named Schwartz, concededly one of defendant's sales agents. He was then asked as to what talk he had with Schwartz relative to purchase of the property. To this defendant's counsel objected on the ground "the negotiations were all merged in the written agreement." After some discussion the court said, "I think for the present that this ought to be excluded until we find out just exactly what was done and whether a purchase was made and so forth." His counsel then further interrogated him as to the contract of purchase, when he moved into the house, description of the house, etc., after which the inquiry was resumed as to previous conversations with Schwartz "in reference to the tenantability of the house." To this defendant's counsel interposed, saying, "That has already been objected to." The court sustained this objection, suggesting, in addition to the ground counsel had urged, that Schwartz' authority must be shown. Schwartz and defendant's sales manager of the so-called "Ferndale branch," under whose directions he operated, were then called by plaintiff for examination upon the subject. Defendant's counsel was prolific in interposing objections to this inquiry, to many of which the court unduly yielded, and neither plaintiff or Schwartz was permitted to tell what was said between them, even in relation to the

contents of the folder quoted from which was shown without dispute to have been issued by defendant, supplied to its salesmen and used by Schwartz in negotiating the sale to plaintiff, within the scope of which plaintiff claimed the right to show Schwartz had falsely told him the furnace was "adequate to properly heat the house in the coldest kind of weather" and "would not burn any more coal than a baseburner."

It was also shown that 25 purchasers of these bungalows, including plaintiff, had, soon after cold weather came, discovered the inadequacy of the furnaces to heat their homes and served upon defendant notice of the fact in writing with an appeal to it for relief. Defendant acknowledged receipt of that notice, upon which it later acted, but when offered in evidence defendant's counsel objected and the court refused to admit the same, or any part of it.

Much controversy arose during the progress of the trial as to the measure and elements of damage. After this had continued for some time plaintiff's counsel asked permission to argue the question of damages and that the jury be excused during the discussion. The court refused to excuse the jury, but permitted counsel to be heard. Plaintiff's counsel then proceeded to cite authorities and argue the question of his right to recover under the three elements of damage already mentioned which the court instead of directly ruling upon argued and severely criticized in a lengthy series of belittling comments in the presence of the jury. Plaintiff claimed as an applicable measure of damages for fraudulent representations the difference between what the property was worth at the time be bought it and what it would have been worth as represented. Of this the court said:

"I am not going into the question of what that property was worth, or what it was worth before and what

it was worth afterwards. The other side might get a verdict on the ground that they gave you something for less than its value. * * * With regard to those things, I shall charge the jury when two men deal with a thing that is subject to inspection, that a man enters into a bargain with his eyes wide open, and he is responsible for what he buys. It is the old, old rule, that you find when you are learning, which was given to you, that the buyer must beware. It is a question of selling what you have, and buying what you get where you can inspect it, and this inspection discloses what you are getting. That is not so, perhaps, with regard to the heater, because we are not all advised as to the value of heaters. I don't know today how much radiation this room would require. If I came in here to buy this building, I could not tell whether these radiators would be sufficient or not. If you sell me this building and say that there is ample radiation, and it turns out there is not, I am defrauded or cheated by what you say, and I have a right to sue, and to have such radiation as to make it proper. If I do, you must respond in damages. Now, that is the situation. But where a man sells a fellow a horse, and there is an opportunity for an inspection, and inspection is had, or, if inspection is waived and the purchase is made, that is the end of the bargain."

Of plaintiff's claim for damages for injury to walls and decorations by reason of moisture and freezing because it was impossible to dry and warm the house with the furnace, the court commented:

"Did they tell you that the walls would sweat? Of course they sweat, every new house, it is presumed, I would assume, and experience and general knowledge shows every house to be subject to something of the kind. They do not put kalsomine on these walls for two or three years, because they expect them to crack. You never saw a new house in your life that didn't have certain little things come up as time went on. Therefore, you do not decorate for a couple of years."

When counsel sought to urge his claim that damages were recoverable because the house knowingly sold

for a home was claimed to be well equipped for heating and tenantable but was not, resulting in discomfort and physical suffering to the family on the sudden advent of extremely cold weather, the court said:

"I am not going into that. Every man, every one of these jurors knows about that. * * * Everybody knows what that winter was. If we went into that there would be no question about it, because they would bring in a thousand other witnesses; they could go out on the street and pick up any man, woman or child, and he would come in and tell you that was a wonderfully cold winter. * * * Why didn't you go out and get some other house?

"*Mr. L.*—They didn't have to go out, that was one of their remedies they could have gotten.

"*The Court*—Gone to the Statler and got a suite of rooms and entertain their friends there?

"*Mr. L.*—They could have proceeded in any one of their remedies, but they chose to stay in the premises, that is the house that they bargained for.

"*The Court*—You think you stumbled on a gold mine here. * * * Were they forced? Who forced them to live in that house? I can't follow you there."

While these comments were not a part of the charge, they contained inapplicable assertions of legal import and statements of fact outside the evidence, made in the presence of the jury after counsel requested they be excused while the legal questions were discussed. In *Jankowski* v. *Skupny*, 209 Mich. 227, similar reflections on plaintiff's claim for damages, including the "gold mine" comment, were noticed with disapproval but treated as harmless error because the record disclosed "that the jury did not reach or consider the question of damages," while in this case the record discloses to the contrary.

Under his claim of fraudulent representations it was plaintiff's right to sue either with or without rescission. *Wegner* v. *Herkimer*, 167 Mich. 587; *Merlau* v. *Kalamazoo Circuit Judge*, 180 Mich. 393. Even

a tenant who remains in possession and thereby waives the right to rescind his lease does not waive his right to a claim for damages resulting from fraudulent representations that the house could be properly heated by the furnace then in it, upon which he relies and is thereby induced to enter into the lease. *Morton* v. *Hanes,* 162 Mich. 366. That plaintiff chose to retain the property he had bought for a home, continue in possession and sue for damages because of false representations as to its condition was not a proper subject of criticism by the court. The general rule of damages in such case is the difference between the value of the property as it actually was at the time of the purchase and what its value would have been had quality and condition been as represented. *Page* v. *Wells,* 37 Mich. 415; *Smith* v. *Construction Co.,* 175 Mich. 600.

Plaintiff testified that previous to his purchase of the property he had no experience with or knowledge of boilers or heating plants, made the purchase believing, induced by, and relying entirely upon representations as to quality and capacity of the plant, as set out in defendant's folder furnished him by Schwartz and the latter's statements in that connection (which he was not permitted to tell), and that after both the old plant and new one defendant installed in houses identical with his had proved totally inadequate he had consulted an experienced engineer and installed a larger boiler of approved capacity and additional radiation in his house at a cost to him of $189.92. He called this heating engineer, who had examined the plant and manner in which it was installed, as an expert witness. He testified to the quality of the building for heating, openings, floor space, radiation required, etc., that he found but 162 feet of radiation in the house, insufficient boiler capacity, and exposed piping not properly covered carried in unheated space under the house outside the basement, where the in-

closing walls were but boards which were not tight, etc. The court criticized and halted plaintiff's attempt to further develop the subject of cold floors and exposed pipes by the following comment:

"Well, now, carrying out your argument to its logical conclusion, if this house had not sides at all, if it was all open, it would have cost perhaps $4,500 for a boiler to heat it around there, to make it fairly comfortable. You would expect then that the owner would give you the house and lot, and possibly pay you something for taking it. That is carrying out your argument."

Plaintiff also introduced the testimony of various witnesses who had lived in neighboring bungalows identical with his, who testified that both the first and second boilers installed by defendant in their houses were unsatisfactory and wholly inadequate. Defendant also called witnesses who had lived in like bungalows who testified that after the second boiler was put in they found the heating plants satisfactorily warmed their houses. A heating engineer from the corporation which furnished the boilers testified as an expert to the capacity of the second boilers to heat the houses when properly run with the right kind of fuel.

The court left those issues to the jury with instructions in part:

"The measure of damages in each case would be the difference between what he bargained for and what he got. In determining that, you will ascertain what would be the real, actual difference in dollars and cents between the boiler that he did receive and the boiler that he was entitled to receive under this representation, if you find the representation was relied upon. * * *

"If there was any duty that devolved upon the defendant by reason of the circumstances, it would be to make good, if there was any defect. I think the defendant claims there was none, except for the inter-

vention of those two things I have already referred to, the lack of ability to get the proper coal for the first furnace, and, secondly, the extraordinary cold winter that we experienced.  If you find there was a defect, that something was lacking, then if there was any duty devolving upon the defendant it was to make good that lack.  If the defendant offered in any way to make good, and the plaintiff refused to accept it, then the defendant should be acquitted of any further responsibility."

The first instruction quoted confines the difference between what plaintiff bargained for and what he got to the boilers, ignoring the issues of proper installation and sufficient radiation.

Assuming the second to be a correct instruction, the jury did not find "defendant offered in any way to make good" nor acquit it of any further responsibility, but rendered a verdict for plaintiff, illogical in amount under the evidence, and convincing that the errors referred to are reflected in it.

The judgment is reversed, with costs to plaintiff, and a new trial granted.

MOORE, WIEST, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.