BRIERE and others, Appellants, vs. TAYLOR and others, Respondents, and SEARLS and another, Appellants.

*November 14—December 12, 1905.*

*Trial: Findings of fact: Partnership: Sharing of profits and losses: Growers' union: Factors: Sales at risk of consignor: Principal and agent: Liability for mistakes: Costs: Discretion.*

1. Under sec. 2863, Stats. 1898, requiring the trial judge to state in his decision separately (1) the facts found by him, and (2) his conclusions of law thereon, the findings of fact need not be more specific than a pleading is required to be; but it is better practice, in order to avoid confusion between findings of fact and conclusions of law, not to state the facts merely according to their legal effect, even when they might be so pleaded.

2. It is not essential to a partnership agreement that it shall contemplate that profits shall be liquidated in the form of money or property in possession for division in the ratio of the interests of the members respectively. It is sufficient if the ultimate result contemplated is a community of profits and losses.

3. Where cranberry growers formed a union for the purpose, among others, of facilitating the marketing of their berries, and it was agreed that each should pay a stipulated proportion of the running expenses, and the profits, if any, were to go to the members in the agreed ratio of their respective interests in the union, there was such community of interest in profits and losses as rendered the agreement one of copartnership.

4. A finding of the trial court that said partnership agreement contemplated the buying and marketing of outside berries by the union for the protection of the common interest is *held* not to be against a clear preponderance of the evidence.

5. Upon forming a union for the purpose of marketing their berries, cranberry growers agreed that each member should retain control of his own crop and might sell all or a part of it himself or permit the union to sell all or a part of it, and that so far as the union should handle the berries of any member it should do so in form as owner thereof, but should sell at a price satisfactory to the member and he should receive the net proceeds and should bear all losses, if any, in the transaction. *Held,* that the union was to act substantially as a factor who takes title to the property, not as owner but as a trustee for sale, and collects the proceeds, but at the risk of the consignor.

6. In such case the difference between the net price received by the union for berries sold by it for a member and the price credited to him when he made the shipment should be charged back to him and not be treated as a loss to be borne by all the members according to their respective interests.

7. The secretary of a cranberry growers' union, who served gratuitously, is not liable for mere mistakes in the distribution of moneys received by the union, made in good faith through a misunderstanding of the rights of the members, especially where the members who received excess payments are abundantly able to make the proper refund.

8. The award of costs in an equitable action is a matter within the sound discretion of the trial court; but where plaintiffs were compelled not only to bring suit to obtain a settlement of the business of an association of which they were members, but also to establish, against vigorous opposition, the nature of the association agreement, they should, to some extent at least, be awarded costs.

APPEALS from a judgment of the circuit court for Wood county: JAMES O'NEILL, Circuit Judge. *Reversed on both appeals.*

Action for an accounting. The plaintiffs' claim was this: They as one party, the defendant *Gaynor-Blackstone Cranberry Company* as another, and defendants *Searls* as Searls Bros. as a third, all being producers of cranberries in 1899, in aid of the economical marketing of their berry crops formed an association under the name of the Cranberry Growers Union to act as a sales agent for its members. Defendant *Taylor* was chosen as secretary and plaintiff *Charles Briere* was chosen as president of the association, each to perform the work appropriate to his position without compensation. *Jacob Searls* was employed at a per diem of $2.50 to solicit orders, it being understood and agreed that all the business should be done in the name of the union. For incidental expenses such as stationery, labels to be placed on barrels of berries, charges and expenses in shipping out samples of berries, and charges for obtaining commercial reports as to customers, it was agreed that each party should contrib-

ute in the proportion which the berries produced by him bore to the amount produced by all parties to the union. Each member paid in money for an expense fund according to such ratio. It was further agreed that each member should furnish the union a sample of his product and fix his 'selling price therefor, and that upon an order being taken for cranberries. by sample it should be filled from the particular product represented by such sample, and that the proceeds when received by the union should be paid over to the person filling the order. Each member reserved the right to sell any or all of his own product. Operating under such agreement the union sold of plaintiffs' berries 843 barrels for $4,517.10, $3,484.26 of which was collected by the union. The expenses of the association were $1,640. Plaintiffs' proportion with $14.40 of special expenses incurred in their behalf, less $100 paid by them into the expense fund, was $362.97. The net amount collected from sales of plaintiffs' berries was $3,101.29, of which they have only received $2,109.71, leaving a balance due them of $991.56. Such balance was paid by *Taylor* to himself and other members of the association as money belonging to them.

The claim of defendants *Jacob Searls* and *Andrew Searls* was substantially the same as that of the plaintiffs, except they denied having received any money belonging to plaintiffs. They claimed in respect to the business of the association done for them, that the union handled 1,097 barrels of their berries, selling the same for $5,764.15, all of which sum was collected except $801.64; that their proportion of the expenses, less the amount paid by them into the expense fund, was $491.28; that they received from the union $3,986.98, leaving a balance due of $484.14, which remained in the hands of the defendant *Taylor* as secretary.

The claim of the other defendants was this: The three parties alleged to have made a mere association to act as a selling agent in fact formed a copartnership under the name of the

Cranberry Growers Union for the purpose of buying and selling cranberries. A secretary and president were appointed to perform services without compensation, and a solicitor was employed to take orders for the sale of cranberries at a per diem of $2.50, as claimed by plaintiffs, and in addition to the employment of *Jacob Searls* as such a solicitor *Andrew Searls* was also employed. By the partnership agreement it was stipulated that the profits and losses of the business should be shared by each member in the proportion which the amount of berries produced by him bore to the total amount produced by all the members of the union in the year 1899. It was further agreed that each member might sell his berries to the union in whole or in part or sell to outside parties at his pleasure, the profits and losses of the union business, however, to be shared according to their respective interests, determined as aforesaid. The union pursuant to the partnership agreement purchased and sold berries produced by its members and by outside parties at a loss in the aggregate of $7,789.21. The proportionate amount of such loss as to each member was as follows: *Gaynor-Blackstone Cranberry Co.* $2,967.34; plaintiffs $2,225.50; Searls Bros. Co. $2,569.42. The Searls Bros. Co. received from the union $718.40 in excess of the amount actually coming to them. They owe the union that amount, while it is indebted to *Gaynor-Blackstone Co.* in the sum of $487.17 and the *Briere-Pomainville Co.* [plaintiffs] in the sum of $266.09.

The claims of the respective parties were set forth in complaint and answers by proper allegations.

The issues between the parties were decided by the trial court, as follows:

1. August 23, 1899, plaintiffs as one concern, the defendants *Gaynor-Blackstone Cranberry Co.* as another, and the defendants *Andrew Searls* and *Jacob Searls* as a third, were producers of cranberries in Wood county, Wisconsin.

2. Between August 23 and August 26, 1899, plaintiffs and

defendants as Searls Bros. Co. and the defendant *Gaynor-Blackstone Cranberry Co.* made a copartnership agreement under the name of the Cranberry Growers Union for buying and selling cranberries. The agreement was wholly oral. *T. A. Taylor* was selected as secretary, *Charles Briere* as president, and *Charles Briere, Andrew Searls,* and *T. A. Taylor* as an executive committee.

3. It was agreed that the expenses of the union should be borne as follows: twelve parts by the plaintiffs, fourteen by Searls Bros. Co., and sixteen by the *Gaynor-Blackstone Cranberry Co.*

4. *Taylor* acted honestly as secretary, bookkeeper, and treasurer of the union in all of its business transactions, and with full knowledge of the members thereof. Defendant *Gaynor* was in no manner connected with the union, except as he and *Taylor* represented the *Gaynor-Blackstone Cranberry Co.* in the formation thereof and at meetings of the association.

5. The union bought and sold cranberries and did other acts incident thereto during the selling season of 1899 for a part of such season, and then by mutual consent ceased doing business. The accounts of the association have never been settled.

6. In the dealings with the union *Jacob* and *Andrew Searls,* sometimes one and sometimes the other, represented Searls Bros. Co., and acted as salesmen. Plaintiff *Briere* represented plaintiffs. *Taylor* represented *Gaynor-Blackstone Cranberry Co.* and acted as secretary and treasurer, and *Briere, Andrew Searls,* and *Taylor* acted as executive committee.

7. The business of the union was conducted at a loss of $7,773.90.

8. The union purchased berries from its members and credited the purchase accordingly on its books. It did not handle the berries of any of them as agent for the producers, but handled the same as its own property.

9. The union books were open to inspection by its members

at all times, and no question was raised as to their correctness until an ineffectual attempt at settlement occurred in April, 1900.

10. There is due from the Cranberry Growers Union to plaintiffs $259.07, to the *Gaynor-Blackstone Cranberry Co.* $482.01, and there is due from the Searls Bros. Co. $703.28, and there is an item due from the bank to the union of $37.80, making the total available assets $741.08.

11. It was agreed upon the trial that if it was decided that the agreement between the parties was that of a partnership the losses should be borne in the proportion of twelve parts to the plaintiffs, twelve to defendants Searls Bros. Co., and sixteen to defendants *Gaynor-Blackstone Cranberry Co.*

On such facts the court held this: The Cranberry Growers Union in all its business transactions was a copartnership and the accounting should be made accordingly. The *Gaynor-Blackstone Cranberry Co.* is entitled to judgment against the defendants *Jacob Searls* and *Andrew Searls* for $444.21, as the sum due it from the union, less the money in the Wood County National Bank. The plaintiffs are entitled to judgment against the defendants *Jacob Searls* and *Andrew Searls* for $259.07, and the bank should pay into the court the money due from it to the union, the same to be thereupon turned over to the *Gaynor-Blackstone Cranberry Co.* in part satisfaction of the sum found due it. Defendants *Gaynor* and *Taylor* should be dismissed from the action without costs.

Judgment in accordance with such conclusions was ordered without costs to either party. Judgment was thereupon entered accordingly. Plaintiffs and defendants *Jacob Searls* and *Andrew Searls* separately appealed.

For the appellants *Briere* and others there was a brief by *Goggins & Brazeau,* and oral argument by *B. R. Goggins.*

For the appellants *Searls* the cause was submitted on the brief of *H. Wipperman.*

*B. M. Vaughan,* for the respondents.

MARSHALL, J.   The main contention of appellants' counsel is that the finding as to the members of the union having made a partnership and no other agreement and that all business transacted as regards handling berries produced by members, as well as in regard to handling outside berries, was within the scope of such agreement, is contrary to the clear preponderance of the evidence.   We shall not incumber this opinion by referring in detail to the evidence on that question.   It is believed that careful study requisite to a thorough understanding of and such appreciation of the weight that should be given to the evidence, direct and circumstantial, as one can reasonably acquire circumstanced as the members of an appellate tribunal necessarily are, has been devoted thereto.

We are unable to reach the conclusion that the decision of the trial court is barren of any finding of fact on the issue as to whether there was or was not a partnership agreement, precluding a decision on the matter here as an original question. While findings of fact should respond in detail to all pleaded facts in issue essential to the cause of action or defense, they need not necessarily be any broader or more specific than a special verdict or a good pleading is required to be.   An allegation in general terms as to a partnership agreement is sufficient to tender the matter as an issue to the adverse party, a denial of it by answer, supported by affidavit, as prescribed by sec. 4197, Stats. 1898, is a sufficient acceptance of the tender, and the decision of the matter under sec. 2863, requiring the trial court to state separately in the decision the facts found by him, need not go into particulars to any greater extent than would satisfy, as before indicated, the test of a good pleading. Mere evidentiary facts need not be stated separate from the conclusion of facts based thereon, and so far as they might be pleaded according to their legal effect, as regards a challenge for insufficiency, they may be so stated in the finding, though the better practice by far is to avoid the latter, since it is liable

to lead to confusion between conclusions of fact and conclusions of law, which should be avoided.

We are unable to agree with appellants' counsel that the finding as to a partnership agreement having been made is in every respect contrary to the clear preponderance of the evidence. There seems to be considerable proof, all or nearly all of a circumstantial nature, though quite persuasive, that as regards everything reasonably germane to finding a market for the berries produced by the members of the union to the best advantage to them respectively, the agreement was characterized by all the essential features of a copartnership contract.

It was not contemplated that the expenses of the union as regards the per diem compensation for solicitors or the outlay for stationery, postage, labels to be placed on barrels, charges in sending out samples of berries, and expense of obtaining information as regards the financial responsibility of proposed purchasers for berries, and similar expenses were to be charged up to the members of the union otherwise than in a ratio corresponding to their respective interests in the union, regardless of the extent to which they might actually use the union agency in the selling of their berries. Each member agreed to pay his stipulated proportion of these expenses regardless of whether it handled the whole or only a small portion of his crop. The profits which it was contemplated the union would make, it was supposed, as it seems, would necessarily go to the members in the agreed ratio of their respective interests, because the only anticipatory profits were such as would accrue to them through that promotion of such interests which concert of action in marketing the berries and maintenance of prices would probably afford. So far as the value of those benefits in the aggregate was in excess of expenses there would necessarily be a gain, and so far as the balance was the other way there would be a loss. In that there was all the community of interest in profits and losses essential

to a partnership agreement. *Bird v. Morrison,* 12 Wis. 138; *Miller v. Price,* 20 Wis. 117; *Spaulding v. Stubbings,* 86 Wis. 255, 56 N. W. 469. It is not essential to a partnership agreement that it shall contemplate that the profits accruing to the business shall be liquidated in the form of money or property in possession for division in the ratio of the interests of the members respectively. If the ultimate result contemplated of the business operations of the association according to the agreement was a community of profits in case of there being any, and of losses if any should accrue, the agreement was of a partnership character.

Whether the partnership agreement contemplated the buying and marketing of berries, as the court found, so far as the finding relates to outside berries to the extent reasonably necessary to prevent them from being offered to the trade to the prejudice of the common interests of the members of the union, is by no means free from difficulty. It would seem that the handling of outside berries to that extent was probably included in the scope of the union agreement from the very nature of it, especially in the light of the way the business was done without definite protest by any one. The trial court was evidently left to determine such scope almost wholly from inference. The efforts made to have the witnesses give the language used by the interested parties when the agreement was made resulted in utter failure, at least except as to one feature to be hereafter discussed. There was evidence to the effect that nothing was said at the time the association agreement was made about buying outside berries, but whether the authority to do so in the event of it seeming to be necessary to protect the common interests might be inferred from what was said as regards marketing berries belonging to members, the record is substantially silent because what was said neither counsel on either side nor the court was able to elucidate from any witness. The most that appears is testimony to the effect that there was

an understanding that the buying of outside berries for the protection of the common interest was to be a part of the union business, and testimony to the effect that there was no such understanding. As to the manner of conducting the business the president of the association testified that on one or more occasions he protested against buying outside berries, yet he fairly admitted that he participated in some of the purchase transactions in a way inconsistent with his having an understanding that such business was not within the association agreement. Further, it does not appear that the ground of the protest was that the marketing of berries produced by members of the union was the sole object of the association contract. It may reasonably be inferred from the language of the protest, as testified to, that it was put upon the ground that as a member of the managing committee the objector regarded the buying of outside berries as unadvisable. Though, as indicated, there is evidence that the witness participated in some of the purchase transactions, he endeavored to explain it, and in one view of the matter denied it, but evidently neither his denial nor explanation was satisfactory to the trial court. Another witness who testified in respect to the matter, appellant *Andrew Searls,* gave evidence fully as unsatisfactory as that of the president. He said he objected to the purchase of outside berries, but he failed to suggest in making his protest that such business was outside of the union agreement. For aught that appears, it was made merely upon the ground that he, as a member of the managing committee, was not in favor of such purchases. In his case, the same as that of *Briere,* there is evidence fairly tending to show that he to some extent participated in outside purchases, as a member of the executive committee. *Taylor,* the other member of such committee, and the only other witness who gave any testimony in the matter worthy of consideration, testified that the outside purchases were made in the regular course of the union business, and that as he remembered it some one of the

members of the union was consulted on each occasion. Taking the evidence as a whole, it was far from being satisfactory. There is very little that is definite either upon one side of the controversy or the other. There is some tending to show, as it seems, that there was either an understanding at the start or that one was arrived at in the course of the union business to handle some lots of outside berries merely to protect the common interest. That was a very natural and probable feature of the partnership agreement. In the ultimate, we are unable to reach the conclusion that the decision of the trial court on this branch of the case is against the clear preponderance of the evidence.

In support of the finding that the union agreement contemplated that the union should become the owner of the berries produced by its members as fast as taken from their stock for the purpose of supplying the trade, we are unable to find any satisfactory evidence whatever. As we view the record the evidence is all the other way. It seems to be established beyond all reasonable controversy, that in handling such berries it was definitely agreed that the union should act in the character of a factor; that it should take the title thereto not as owner but as trustee for sale; that each order for berries was to be filled out of the particular stock represented by the sample by which the order was taken at the option of the owner of such stock; that the sale, though made in the name of the union, was to be for the person furnishing the berries, the net proceeds to be rendered to him, and he to bear all losses there might be in the transaction; the business to be conducted in every respect the same as between a commission merchant and his consignor. The witnesses on both sides, in substantial harmony, so testified in respect to the matter.

It seems that the learned trial court gave controlling significance to the fact that the union agreement seemed clearly to contemplate that in handling the berries the union should take the title thereto. In our view, that has no significance

whatever in face of the positive evidence that each member was to retain control of his crop of berries and sell all or a part of them himself, or permit the union to sell all or a part of them as he saw fit, and that to the extent to which the union handled the crop of any member it should do so by selling such berries by sample or otherwise at a price satisfactory to such member, who should receive the net price thereof. That feature of the agreement with the one that the union was to handle the berries of its members, so far as it handled them at all, in form as owner, as regards the parties, shows conclusively that the union was to act in the manner substantially as a factor who takes title to property for sale in his own name and collects the proceeds, but at the risk of the consignor, so far as the consignment agreement, express or implied, is not violated. *Beardsley v. Schmidt,* 120 Wis. 405, 98 N. W. 235.

Complaint is made because in the accounting freight, cartage, brokerage, shrinkage, and the difference between the net price to the union from customers for berries sold for members and the price of the berries as credited to members were treated as losses to be borne by all members according to their respective interests. Sufficient has been said to indicate that such method of accounting was wrong. The difference between the net amount to the union, after taking account of all cartage, freight charges, brokerage, shrinkage, and other deductions, which any particular shipment of berries out of the stock of a member yielded and the amount credited to such member at the time of the shipment should have been charged back to him.

Further complaint is made because the court dismissed the action as to defendants *Gaynor* and *Taylor.* No serious complaint seems to be made as to the former. The record does not disclose that either of the parties took any of the money which came into the possession of the union for their own benefit. The most that is shown is that *Taylor* by mere mis-

take as to the nature of the union agreement paid money received by him as secretary for the benefit of one or two members, which upon a proper accounting would have been differently directed. No question seems to have been raised that the members receiving excess payments are not abundantly able to make the proper refund. *Taylor* was not the agent of any member in any transaction,—he was a mere employee of the union serving gratuitously. The union was the agent for its members. Under those circumstances we are unable to see any reason in law or equity for holding *Taylor* liable for his mere mistakes, which members of the union who received the benefit are abundantly able to remedy. Obviously, *Taylor* could not properly be brought into and charged in this litigation with improperly distributing money, except on the ground that he was liable to the union as having violated the trust relation between him and it to the latter's injury. An agent is never liable to his principal for a mere mistake in the performance of a duty within the general scope of his authority. That is all that occurred in this case. The whole matter by common consent was left to *Taylor* to distribute the money received for berries according to the rights of parties as he understood them, and without compensation for his services. He determined the relative rights of members honestly, but wrongly, yet without negligence, so far as appears. The court found that he acted in the most perfect good faith, and we are unable to discover anything in the record casting doubt on the correctness of that finding. An agent who performs gratuitous services and is not permitted to do so because of his holding himself out to be particularly skilled in the matter, is only liable for the fair exercise of such capacity as he possesses. Mechem, Agency, § 499. Many authorities state the rule still stronger and to the effect that in a case of gratuitous agency not implying any peculiar knowledge or skill, the agent is only liable for loss happening through his gross neglect or wilful and malicious fraud. 1 Am. & Eng. Ency.

of Law (2d ed.) 1070. An examination of the authorities, however, upon which the text referred to is grounded, indicates that the term gross negligence is not used in the sense in which it is understood here, but rather in the sense of inexcusable failure,—mere inadvertence,—to exercise the care which the particular person is accustomed to exercise in the same and similar cases of his own. *Tracy v. Wood,* 3 Mason (U. S.) 132, 24 Fed. Cas. 117; *Persch v. Quiggle,* 57 Pa. St. 247; *Eddy v. Livingston,* 35 Mo. 487.

Error is assigned because costs were not awarded to the plaintiffs. That was a matter within the sound discretion of the trial court. If the result reached below had been the same as that now arrived at, most likely a different determination would have been made of the question of costs. As the case now stands, plaintiffs were not only compelled to invoke judicial assistance to obtain a settlement of the union business, but to establish, contrary to the vigorous opposition of respondents, the nature of the union agreement. It seems that they are fairly entitled to some consideration in the matter of costs. They should be allowed in the final disposition of the cause in the trial court their disbursements and taxable costs, and attorneys' fees not exceeding $25.

The general result of the foregoing is this: The union agreement included a partnership feature and an agency feature of the sort between a factor and his consignee as well. The former included the business of finding customers for berries produced by members, so far as they desired that to be done, and the handling of outside berries, so far as that seemed necessary for the protection of the common interest, which it is held covers the instances where business of that nature was transacted. The agency feature covers the transactions of shipping berries out of stocks belonging to members, in form as owner, and collecting and accounting for the proceeds to each member for the net amount received for berries sold for him. The relations between the union and a member, as re-

gards the selling by the former of berries belonging to the latter, was similar to that between a factor and his consignor. In the accounting the expenses such as the per diem compensation of solicitors for customers for berries, the expenses of postage, stationery and labels, and charges for sending samples and the outlay for obtaining information as to the responsibility of proposed purchasers, and any other similar expenses, should be regarded as partnership outlays, to be charged to the members in accordance with the ratio agreed upon, as stated in the findings. The contributions made by members to the expense fund should be properly credited. All expenses of handling outside berries and all losses incurred in such business should be charged in the proper proportions to the members respectively. The berries furnished by any member should be credited to him at the price he turned the same over to the union as sales agent for, and he should be charged with the difference between that amount and the net sum which the union actually collected for the property, in case of there being a difference, and in case of there being an excess the same should be treated as partnership assets. Each member should also, of course, be charged with the payments made to him.

*By the Court.*—The cause is reversed on both appeals, and remanded with directions to state the account between the parties to the litigation in accordance with this opinion, and to render judgment accordingly, with costs in favor of plaintiffs to the extent of their disbursements, and taxable attorneys' fees not exceeding twenty-five dollars.