198

Estate of Mohr.    [Two appeals.]

*March 7—June 29, 1933.*

*A. W. Lueck* of Beaver Dam, for the Burbach Estate.

*H. B. Rogers* of Portage, surviving executor, *in pro. per.*

For Maude Mohr Griffith and Robert Griffith there were briefs by *Grady, Farnsworth & Walker* of Portage, attor-

neys, and *Dorothy Walker* as guardian *ad litem* for Mary Virginia Griffith.

For Mary Louise Burbach and Betty Burbach there was a brief by *Perry C. Stroud* of Portage, guardian *ad litem*.

The following opinions were filed April 11, 1933:

NELSON, J. Certain facts common to both appeals will first be stated, after which the separate appeals will be considered, in connection with the specific facts relating thereto. C. F. Mohr was for many years engaged in the retail lumber business in the city of Portage and was for many years also engaged in manufacturing and selling lumber at wholesale in Northern Wisconsin. His family consisted of his wife and two daughters, Musa (Mrs. Frederick E. Burbach) and Maude (Mrs. John S. Griffith). Both of his sons-in-law were employed by him. Mr. Griffith was in charge of the lumbering operations in Northern Wisconsin. Mr. Burbach assisted Mr. Mohr in the latter's lifetime in managing the Portage retail lumber yard, and after his death he managed it for the estate. Mrs. Mohr predeceased her husband a number of years, after which he resided at Tomahawk for several years and then returned to his home in Portage, where he continued to reside with Mr. and Mrs. Burbach until his death which occurred on November 23, 1923.

Mr. Mohr left a will which was duly admitted to probate. After directing the payment of his debts and devising certain real estate in the city of Tomahawk to his two daughters in common, the will bequeathed to each of his sons-in-law, Frederick Burbach and John Griffith, the sum of $10,000.

The residue of the estate was given to his two daughters. Frederick Burbach, John S. Griffith, and H. B. Rogers of Portage, nominated as executors without bonds, were duly appointed and qualified as such.

At the time of the death of Mr. Mohr his estate was appraised at about $140,000, but he owed large sums of money. Claims totaling about $96,000 were filed against his estate, principally for obligations assumed in behalf of the lumber company at Tomahawk. The Tomahawk company had never proved profitable and it was liquidated several years after his death through a proceeding in bankruptcy. The retail business at Portage was, however, both before and after Mr. Mohr's death, profitable and contributed considerable sums of money which were used by the executors in paying up the indebtedness of the estate. This business was carried on by the executors under the direction of the court with the consent of all the legatees and devisees. The Mohr estate was apparently looked upon as belonging to the Burbachs and the Griffiths, and certain practices of withdrawing funds therefrom were countenanced by all parties interested with the exception of Mr. Rogers, who objected to any advancements being made or withdrawals permitted until the claims allowed were fully paid.

*Burbach Appeal.*

Frederick E. Burbach died testate on January 31, 1931. His will was admitted to probate in the county court of Columbia county and A. W. Lueck is the administrator *de bonis non* with the will annexed of said estate. Musa Mohr Burbach predeceased him on April 13, 1925. After Mr. Mohr's death Burbach was appointed one of the executors and was also employed by the executors as the manager of the lumber yard at Portage. Griffith died September 5, 1926, and the Mohr estate was thereafter administered by Burbach and Rogers. In 1930 an audit of the affairs of the Mohr estate was prepared by McMurry-Smith & Company of Madison. A portion of said audit was entitled "Payments to F. E. Burbach," from which it appears that he had withdrawn from the funds of the lumber yard in excess of his salary the sum of $3,281.58. Mr. Burbach,

from time to time, issued company checks in payment of his current bills. He also issued checks to his wife and to his sister-in-law, Mrs. Griffith. All of the checks issued to his wife and to Mrs. Griffith, which are involved in the excessive overdraft, were charged to him on the books of the lumber yard. On July 1, 1930, Rogers and Burbach, as surviving executors, made application to have the time in which to settle the estate extended, and all parties in interest, including Burbach, signed a waiver of notice and stipulation, which contained the following recital:

"We, the undersigned, do hereby enter our appearances in writing and consent that said application may be heard without further notice; that the account of said executors as prepared by McMurry and Smith may be settled and allowed by the court; that the disbursements incurred for such audit may be paid from the assets of said estate and credited in the account of said executors."

Hearing was held upon the auditors' report which was treated as an interlocutory account of the executors. Thereafter an order was entered extending the time to settle said estate and allowing the audit as an interlocutory account, which order contained the following recitals:

"It appearing that said executors have caused an audit of the books of said estate to be made, which audit constitutes the account filed by them, and the executors having appeared, etc., . . . 
"It is ordered and adjudged that the account of said executors as shown by said audit be and the same is hereby settled and approved, and that said audit be taken as the basis for all further accounts to be filed by them herein."

That part of the audit which deals with Burbach's indebtedness contains items aggregating $1,915 charged to Burbach but paid to Mrs. Griffith. The following is typical of such entries:

"March 19, 1925, F. E. Burbach—Mrs. J. S. Griffith, check #107, payable to Mrs. J. S. Griffith, $150."

The several checks issued to Mrs. Burbach and charged to his account aggregate a considerable sum. The following is typical of such entries: "10-13 F. E. Burbach—Musa, $100."

The county court held on the petition herein that the total amount of the overdrafts as revealed by said audit should be offset against the legacy given to Mr. Burbach.

The facts relating to the amount of $4,906.77, also directed by the county court to be offset against the bequest to Burbach, are in substance as follows: Burbach, as one of the executors and manager of the lumber yard at Portage, entered into a contract with one Allen for the erection of a house for him in the city of Portage. Allen failed to meet the payments as agreed and in March, 1930, Burbach caused a mechanic's lien to be filed against the property for the sum of $7,420.07 in which the date of the last charge of the furnishing of materials was stated to be January 3, 1930. The last date of furnishing materials or performing labor was in fact December 17, 1929. The date entered on the books of the company was January 3, 1930. This discrepancy is explained by the fact that the mason subcontractor came to the lumber company's office on December 29, 1929, some considerable time after his work was completed, for the purpose of adjusting his account with the lumberyard office. On that date he was given credit for his work on the Allen house and on January 3d that credit was entered as a charge against Allen. On December 23, 1930, Burbach filed an affidavit for the purpose of extending the time to commence the action to foreclose the said lien. Assuming that the date of the last charge was December 17, 1929, as found by the court, and about which there is no dispute, the affidavit of renewal was not filed in time. Allen and wife gave to a bank in Portage a mortgage for $4,000 on the property covered by the lien, and upon foreclosure of the lien the bank asserted the priority of its mortgage.

In that action it was held that the lien had ceased to exist as a valid lien. Thereafter the estate purchased the outstanding equity in order to protect itself. The court authorized the surviving executor to offset against the Burbach legacy the sum of $4,906.77, being the amount of the mortgage, plus interest and expenses paid.

Did the court err in authorizing and directing that the whole amount of the overdraft in the Burbach account be offset against the bequest given him by the Mohr will?

It is contended on behalf of the Burbach estate that the withdrawal made by Burbach for the apparent use and benefit of his wife should be charged to her residuary share of the estate and not offset against his bequest. That the withdrawals made by Burbach which were paid to Mrs. Griffith should be charged to her share of the residuary estate and not offset against his bequest. As to the items which were paid over to Mrs. Burbach and to Mrs. Griffith, it appears without dispute that they were charged by Burbach to his own account on the books of the lumber company; that such charges were interspersed with other charges represented by checks issued by him to pay his personal obligations and living expenses. There is good reason for inferring that as between Burbach and the estate he intended that the checks so issued by him as manager to his wife and to Mrs. Griffith should be considered as his obligations. Had he intended to make advancements as executor to his wife and to Mrs. Griffith as residuary legatees, it seems reasonable to suppose that he would have opened up accounts in which they were separately charged with such advancements. It appears too that at the time the audit was made he was in charge of the lumber-yard office, assisted in the preparation of the audit, and was no doubt familiar with it when it was completed and presented to the court as an interlocutory account of the executors. He was present at the hearing on the report or account, at which time con-

siderable testimony relating to it was taken. He offered no objection to it.

In its decision rendered August 31, 1932, the court expressed the opinion that the audit, which was treated as an interlocutory account by all of the parties, was final and conclusive as to all matters embraced therein; in other words, *res adjudicata.* In the formal findings of fact, however, filed thereafter, no mention was made of the conclusiveness of such order and the conclusions of law are not based thereon. We think the court was fully justified in concluding from the evidence, independently of the conclusiveness of the report and order based thereon, that as between the estate and Burbach the numerous items charged to him, which gave rise to the overdraft, were the obligations of Burbach. Whether or not Burbach expected to be reimbursed by his wife when she came into her share of the estate the evidence does not reveal. That question was not considered at the hearing held on the auditors' report filed as an interlocutory account. As to that question it is therefore our opinion that the Burbach estate is not concluded by such order.

As to Mrs. Griffith, there is evidence to support the conclusion that the moneys were paid to her pursuant to an arrangement or understanding between Burbach and his wife on the one hand and Mrs. Griffith on the other, the purpose of which was to reimburse Mrs. Griffith for care which she had rendered to Mr. Mohr in his lifetime, and equitably to adjust as between the sisters the financial advantage which the Burbachs had enjoyed by virtue of having resided in Mr. Mohr's residence for a mere nominal rental. Under date of May 28, 1925, Mr. Burbach wrote to Mr. Griffith in part as follows: "I am inclosing a check to Maude for the monthly payment on the board bill."

This language is quite significant as revealing that the payment was made on a board bill and was a monthly pay-

ment. The audit of Burbach's indebtedness to the estate hereinbefore referred to shows that commencing in February, 1925, and ending in February, 1926, he made monthly payments to her, with the exception of the month of September, and charged all of such payments to himself. We think the court was warranted in authorizing the indebtedness owing the estate by Burbach which arose out of the withdrawals by him in excess of his salary to be offset against his bequest. *Will of Weidig,* 207 Wis. 107, 240 N. W. 832.

Did the court err in authorizing and directing the executor to offset against the bequest of Burbach the amount of loss sustained by the estate as a result of his failure to make and timely file an affidavit extending the time in which to commence foreclosure of the Allen lien?

Mr. Burbach, it will be remembered, at the times the Allen contract was entered into, the original lien filed, and the renewal affidavit made and filed, was both an executor of the will and the manager of the Portage yard. It appears that his management of the yard was in general highly successful. However, it appears without dispute that the date of the last charge for labor performed or materials furnished in connection with the Allen contract was December 17, 1929, not January 3, 1930, although the last entry or charge against Allen was, so far as the books were concerned, January 3, 1930. The lien was filed March 26, 1930, evidently because Burbach knew that Allen was not financially responsible and that the filing of a lien was necessary in order that the estate might be protected. The amount of the lien was over $7,000 and therefore represented a very substantial amount. The lien was filed rather promptly, long before the six months' period had expired. At the time Burbach filed the renewal affidavit nothing had been paid on the claim for lien. The matter of preserving this lien was therefore of considerable importance to the estate and required the exercise of reasonable care, skill, and judgment in

attending to the matter of its renewal. While it is easy to understand how the error as to the date of the actual last charge crept into the books and how such error was thereafter acted upon in making out the claim for lien and the renewal affidavit, we conclude that the finding of negligence on the part of Burbach as found by the court should not be disturbed.

It is vigorously contended by the attorney for the Burbach estate that Burbach's mistake was merely one of law, for which neither he nor his estate should be held liable. It is argued that the meaning of the language "date of last charge" as found in the statute was not so well defined as to permit the holding that Burbach, as manager, should have known that "date of last charge" was synonymous with "date of last delivery of materials," or "date of last performance of work and labor," rather than the date of the last entry on the book account. Prior to the decision in *Usiak v. Kubiak,* 198 Wis. 600, 225 N. W. 168, which was decided in April, 1929, this court seems not to have specifically said that the word "charge" does not mean a mere bookkeeping entry as distinguished from the obligation which arises at the time materials are furnished or labor performed. However, this court had theretofore repeatedly treated the words "last charge" as being synonymous with the date of the last actual performance. *Fowler v. Bailley,* 14 Wis. *125, 136, "date at which the last article was furnished;" *Chapman v. Wadleigh,* 33 Wis. 267, "date of last delivery of lumber;" *Kerrick v. Ruggles,* 78 Wis. 274, 47 N. W. 437, date machinery was shipped; *Williams v. Lane,* 87 Wis. 152, 58 N. W. 77, date of last work performed; *Layne-Bowler C. Co. v. Peshtigo P. Co.* 194 Wis. 631, 217 N. W. 312, time that the last work was performed. We think the members of the bar of this state clearly understood in 1930 the meaning given by this court to the "date of last charge" and that Mr. Burbach would have been

correctly advised as to such meaning had he stated the facts to his co-executor, Mr. Rogers, or to any other reputable and experienced attorney.

The rule as to the liability of an agent for a mistake of law is well stated in 2 Corp. Jur. p. 722, where it is said that an agent is not an insurer and is not "liable if he has acted in good faith and with due care, for losses due to a mere mistake, including losses arising out of mistakes in doubtful matters of law, nor for losses due to an error of judgment in regard to matters with which he is invested with discretionary powers." We conclude that Burbach did not act with respect to a doubtful matter of law, and we cannot say that the court erred in permitting the executor to offset the loss sustained by the estate which resulted from his negligence in erroneously entering and acting upon a charge on the books which was more than two weeks later than the actual date of the last charge.

### Griffith Appeal.

Did the court err in authorizing and directing the executor to offset against the Griffith legacy the amounts which Griffith in his lifetime owed the estate?

It will be remembered that Mr. Mohr in his lifetime was the principal and controlling stockholder in the Mohr Lumber Company, a corporation of Tomahawk. In January, 1920, Mr. Mohr and Mr. Griffith entered into a contract with Mr. Schubring of Wausau whereby they agreed to purchase from the latter 450 shares of that company's stock for the sum of $45,000, payable as follows: $10,000 at the time of entering into the contract and the remainder on or before four years thereafter. Mr. Mohr paid the first $10,000, obtaining the money from his brother. The lumber company thereafter and prior to the death of Mr. Mohr paid from its funds to Mr. Schubring the sum of $23,585.30. The several payments made by the lumber company aggre-

gating the sum mentioned were, at the time of the death of Mr. Mohr, charged on the books of the lumber company to Mohr and Griffith. At the time of Mr. Mohr's death there was still owing on said contract the sum of $13,000 and certain interest. Mr. Schubring filed his claim for said balance against the Mohr estate. It was allowed in the amount of $14,671.48 and paid some time prior to the liquidation of the lumber company as a bankrupt. Prior to its bankruptcy Mr. Griffith took from the lumber company materials of the value of $2,378.31 for the purpose of constructing a lodge on one of the northern lakes. The materials so taken were first charged to Griffith on the books of the lumber company. At the time the company went into bankruptcy it owed to Mr. Mohr, or to his estate, the sum of approximately $51,000. To handle the indebtedness of Griffith to the company it was arranged principally by him, with the consent of the trustee and with the knowledge of Mr. Rogers, that the total indebtedness charged to Mohr and Griffith jointly and to Griffith individually be charged to the Mohr estate and offset by the trustee in bankruptcy against the indebtedness owing the Mohr estate. On March 1, 1926, Griffith wrote Rogers, among other things, as follows:

"Reinholdt (the trustee) tells me that he has a letter from you saying that you had not received my letter in reference to adjustment of my account with the Mohr Lumber Company. I wrote you several weeks ago, and have been waiting an answer. However, I will again put the proposition as then. My account with the company amounting to some $13,000 plus will in some way have to be paid. I asked Sutliffe and Reinholdt if they would accept a portion of my account such as would be due other creditors other than the C. F. Mohr estate and to reduce the C. F. Mohr claim to equal such an amount, and then have the estate deduct a like amount from that part of the estate due me and also from that due Maude. They did not see why such an ar-

rangement could not be made providing the administrators of the estate agreed."

On March 3, 1926, Mr. Griffith in a conversation with Mr. Rogers, as co-executor, stated that he had taken materials of the value of $2,378.31 from the lumber company and had charged the amount thereof as a credit against the account which the lumber company owed to the estate, and further stated that that amount was to be deducted from his share of the estate. On the same date Mr. Rogers notified him by letter that the right to offset the $7,335.74 paid by the estate upon his share of the Schubring claim would be asserted, as follows:

"The situation with respect to the claim of the company against you is difficult as I view it. The contract between Schubring and you and Mr. Mohr makes you an equal owner with Mr. Mohr in the stock purchased, and it seems clear to me that inasmuch as the estate will be obliged to pay that claim that one-half of that amount will, of necessity, be charged against your legacy, so that there would be not to exceed $2,000 which could be applied toward this indebtedness, and as the amount which Maude will ultimately receive is dependent upon the amount we will be able to realize on the real estate and business here, I do not know how the matter can be arranged at this time."

The whole amount of the Mohr-Griffith indebtedness to the company was however charged to Mohr and deducted from the amount of the estate claim against the company.

The right of an executor to offset indebtedness owing an estate by an heir or legatee against a bequest cannot be doubted. *Will of Weidig, supra.* But it is contended that the right of setoff may be· effectually employed only in case the indebtedness owing by a legatee is not barred by the statute of limitations. Such is the holding in *Will of Weidig, supra.* In that case the indebtedness owing was not outlawed at the time of the death of the testator but was outlawed at the time the contingent bequest vested. In that

situation it was held that the right of setoff did not exist. This court has not passed upon the question as to whether the statutes of limitation continue to run after the interest in an estate vests in an heir or legatee, and during the pendency of an estate as to indebtedness owing an estate at the time of the death of the testator or intestate but upon which the statute of limitations has at that time not run. It is contended by appellants that the statute continues to run until the offset is asserted; that in this case the surviving executor did not assert the right to an offset until 1932 when the petition herein was filed with the court; that at that time the statute had so run as effectively to bar the asserted setoff.

We do not deem it necessary at this time to decide whether the statute of limitations continues to run on an indebtedness owing an estate by an heir or beneficiary after the interest in an estate or bequest has vested. We prefer to ground an affirmance of the order of the trial court in this case upon the doctrine of estoppel. Mr. Griffith was one of the executors. It was his duty to pay his share of the indebtedness owing to Mr. Schubring. Not having done so and the whole claim having been allowed against the Mohr estate, it was his duty as one of the executors to collect from himself what was due the estate by virtue of the payment of the Schubring claim on which he was jointly liable. This he failed to do. He joined in a petition to extend the time for the settlement of the estate. He manipulated the accounts of the lumber company with the result that the indebtedness owing it by him was charged to the estate and deducted from the amount which the company owed the estate. He acted in a similar manner with respect to the value of the materials which he had taken from the lumber company for his own use. He notified his co-executor that his indebtedness to the estate and the value of the materials taken and thereafter deducted from the claim of the estate

against the bankrupt company should be deducted from his share and that of his wife. The estate was obviously treated by both Burbach and Griffith and their respective wives, the residuary legatees and devisees, as a family affair, and both Burbach and Griffith adopted and followed practices, apparently with the consent of all, which would not have been tolerated in other businesses. Under all of the circumstances we think that justice requires that it be held that Griffith were he living would be estopped to claim that the statute of limitations had run against his indebtedness to the estate, and that his heirs at law are not in any position to claim that his conduct did not give rise to the estoppel. See 37 Corp. Jur. pp. 725–727, § 44, where numerous cases are collected which hold that a party may be equitably estopped to claim the benefit of the statute of limitations.

*By the Court.*—The order is affirmed.

FRITZ, J. (*dissenting*). I do not concur in holding that F. E. Burbach was guilty of negligence because he erred in believing that January 3, 1930, was the correct date of the last charge for labor and materials, under the Allen contract; and that, therefore, the period for filing an affidavit to extend the time for commencing an action for the foreclosure of the lien was to be computed from that date, instead of December 17, 1929. It is undisputed that that last charge was entered on the books of the lumber-yard business, of which Burbach was manager, under date of January 3, 1930, by some one who presumably did so in good faith. There is no sufficient basis for inferring that that entry was made as of that date because of any negligence on the part of Burbach. It is unreasonable and unwarranted to hold that mere errors on the part of Burbach, acting in good faith, in believing that entry to be correct, and in concluding, upon the question of fact and law mixed, that it was from that date as entered upon those books that the

year for filing the affidavit was to be computed so as to render him guilty of negligence, because of which his estate should be held liable to his employer for the loss which resulted upon the subsequent discovery of the error. "An agent is never liable to his principal for a mere mistake in the performance of a duty within the general scope of his authority." *Briere v. Taylor,* 126 Wis. 347, 359, 105 N. W. 817; *Page v. Wells,* 37 Mich. 415, 420; *Morris v. Union Nat. Bank,* 13 S. Dak. 329, 83 N. W. 252, 50 L. R. A. 182; *Weymer v. Belle Plaine Broom Co.* 151 Iowa, 541, 132 N. W. 27.

The following opinion was filed June 29, 1933:

NELSON, J. (*on motion for rehearing*). The Burbach estate moves for a rehearing and asserts (1) that this court erroneously concluded that the county court did not base its decision on the conclusiveness (*res adjudicata*) of the order entered on the interlocutory account in November, 1930, and (2) that this court erroneously treated the advancements to Mrs. Griffith as payments in discharge of a liability of both Burbach and his wife, when as a matter of fact there was no liability of Burbach to Mrs. Griffith,—the only liability being that of Mrs. Burbach.

The Burbach estate criticizes the following language of the opinion as not being supported by the record:

"In the formal findings of fact, however, filed thereafter, no mention was made of the conclusiveness of such order and the conclusions of law are not based thereon. We think the court was fully justified in concluding from the evidence, independently of the conclusiveness of the report and order based thereon, that as between the estate and Burbach the numerous items charged to him, which gave rise to the overdraft, were the obligations of Burbach."

So far as the first sentence is concerned the criticism is merited. That sentence does not correctly state the facts.

The petition of the surviving executor for an order permitting him to make certain offsets against the Burbach legacy, and the objections of the Burbach estate thereto, gave rise to a number of questions, among which were the following:

(1) Were the withdrawals made by Burbach in excess of his salary which were by him charged to his account on the books of the lumber yard, as between him and the Mohr estate, properly chargeable to him and properly allowable as offsets against his legacy; (2) should the amounts that were apparently withdrawn for the benefit of Mrs. Burbach be treated as moneys turned over by him individually to her or as moneys advanced by him as executor to her as a residuary legatee; and (3) should the amounts that were withdrawn by him, by issuing checks of the lumber yard to Mrs. Griffith, be considered as payments made in discharge of an obligation owing by him and his wife (or his wife) to her or as advancements made by him as executor to her as a residuary legatee?

As to the first question, there can be no doubt that the county court considered the order of November, 1930, as final and conclusive as between the Mohr estate and the Burbach estate. In its written decision the county court stated:

"In November, 1930, following an audit of the books of the C. F. Mohr estate by the McMurry, Smith Company, surviving executors Rogers and Burbach filed an interlocutory account of their administration, and upon waiver by all parties interested in the estate a hearing was duly had thereon on the 28th of November, 1930.

"This report embodied the McMurry audit. Mr. Burbach appeared upon the hearing and had no criticism to offer of the account—his account. The account was approved by the court and the order entered recited:

" 'It is ordered and adjudged that the account of said executors as shown by said audit be and the same is hereby settled and approved and that such audit be taken as the basis of all further accounts to be filed by them herein.'

"This was intended by all parties in interest, and by the court, to be final and conclusive as to all matters embraced in the account, and I have no doubt it is. The court could not consider it otherwise if it were so disposed. *Schinz v. Schinz,* 90 Wis. 236, 63 N. W. 162."

The findings of fact are in accord with the decision. The county court therefore considered that the order of November, 1930, was final and conclusive as between the Mohr estate and Burbach, and, in our opinion, the county court properly so held. *Schinz v. Schinz, supra; Will of Rice,* 150 Wis. 401, 458, 136 N. W. 956, 137 N. W. 778; *Will of Pattison,* 190 Wis. 289, 298, 207 N. W. 292.

As to the second question it does not appear that the county court based its decision wholly on the conclusiveness of the order of November, 1930. The county court stated in its decision:

"Until the creditors were paid in full, Mr. Burbach, as executor, had no right to make any payments or advances to either specific or residuary legatees. Certainly he had no right to make any as manager. I do not recall that he ever consulted me about this or any other matter in connection with the estate, but Mr. Rogers, his co-executor, informed him that such payments could not be made. If these charges to his own account were actually advances to his wife and to Mrs. Griffith out of the estate, the proofs before the court are not sufficient to warrant such finding. This independent of the fact that these matters are now *res adjudicata.*"

If the county court intended to hold that the order of November, 1930, was *res adjudicata* as to any claim that Burbach might assert against his wife or Mrs. Griffith, such view was, in our opinion, erroneous. As stated in the opinion, "that question was not considered at the hearing held on the auditors' report filed as an interlocutory account. As to that question it is therefore our opinion that the Burbach estate is not concluded by such order." The facts

are not disputed that Burbach withdrew moneys from the Portage yard, charged them to himself on the books of the company, and earmarked such charges "Musa," which tended to show that the moneys were withdrawn for his wife. His wife, however, died in 1925. During the intervening years up to 1931 when Burbach died, no claim was made by him against her estate and nothing was done to indicate that he claimed to be a creditor of her estate. While the county court found as a fact "that it appears from the audit that a large part of the overdraft charged to Mr. Burbach prior to his wife's death, amounting to approximately $2,102.63, resulted from payments made for the exclusive benefit of his wife, Musa Mohr Burbach, one of the two residuary legatees," it made no conclusion of law based upon that finding. Whether this was an oversight we cannot say, although the court had theretofore stated in its decision that the proofs before the court were not sufficient to warrant a finding that the charges to his own account were actual advances to his wife.

As to the third question, it appears as stated in the opinion that "there is evidence to support the conclusion that the moneys were paid to her (Mrs. Griffith) pursuant to an arrangement or understanding between Burbach and his wife on the one hand and Mrs. Griffith on the other, the purpose of which was to reimburse Mrs. Griffith for care which she had rendered to Mr. Mohr in his lifetime, and equitably to adjust, as between the sisters, the financial advantage which the Burbachs had enjoyed by virtue of having resided in Mr. Mohr's residence for a mere nominal rental."

The county court found as a fact "that there was also included in said sum payments to the amount of $1,915 made to Maude Mohr Griffith, the other residuary legatee, which payments were made pursuant to an agreement between Musa Mohr Burbach and her sister, Maude Mohr

Griffith, to equalize expenses incurred in the care of their father by Mrs. Griffith," but concluded as follows:

"That the interlocutory account filed by Frederick E. Burbach, wherein he charged himself with $1,915, is final and no portion thereof should be charged against Maude Mohr Griffith or allowed as a credit in favor of Frederick E. Burbach."

While the language of the conclusion of law just quoted, when considered alone, supports the contention that the county court based its conclusion upon the finality of the interlocutory account, it does not so appear when considered in connection with the thirty-fifth finding of fact as amended. It appears to us, therefore, that the county court intended to hold independently of the conclusiveness of the interlocutory account that, on the facts presented, the Burbach estate was not entitled to have the $1,915 paid to Mrs. Griffith charged against her interest in the Mohr estate. As stated in the former opinion, we think that the evidence sustains that holding and that the conclusion of the county court did not in fact rest upon the conclusiveness of the order of November, 1930.

Whether the Burbach estate has a claim against Mrs. Burbach's estate has never been determined and could not properly have been determined in this proceeding. Her estate was not a party to this proceeding. While the county court stated in its decision that the proof was insufficient to warrant a finding that the payments made by Burbach for the exclusive benefit of his wife were advancements, it did not determine whether the payments made by Burbach to his wife were gifts or loans. It would have been improper to determine that question in this proceeding.

*By the Court.*—Motion denied.