IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 13, 2004 Session

## AMELIA SWAFFORD v. BOBBY M. JOHNSON, ET AL.

**Appeal from the Chancery Court for Sumner County**
**No. 95C-264      Tom E. Gray, Chancellor**

_____

**No. M1999-00463-COA-R3-CV - Filed July 22, 2004**

_____

The instant appeal was stayed in 1999 by this Court's order upon suggestion of bankruptcy. The stay has been lifted, and the case proceeds on Amelia Swafford's appeal from the trial court's order in favor of the defendants Bobby and Betty Johnson and Old Hickory Engineering & Machine Co., Inc. ("OHEMCO"). We reverse the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

Christopher R. Fox, Jason S. Mangrum, Lebanon, Tennessee, for the appellant, Amelia E. Swafford.

Bobby M. Johnson, Betty A. Johnson and Old Hickory Engineering & Machine Co., Inc., Pro Se Appellees

**OPINION**

In 1993, Bobby and Betty Johnson sought to sell a machine shop business which made and repaired compressor parts. As a result of the inquiries made on behalf of one Ray Farmer and the appellant Amelia E. Swafford, the business, Old Hickory Engineering & Machine Co., Inc. (OHEMCO) was not sold. Instead the parties entered into business together. Mrs. Swafford was hired by OHEMCO as a "full-charge" bookkeeper. At the same time she entered into a stock purchase agreement with Betty and Bobby Johnson whereby she attempted to obtain 15% of the corporate stock for the sum of $50,000. From her date of hire in January of 1994 until the last day she worked with OHEMCO in May of 1995, relations between Mrs. Swafford and the Johnsons were difficult. Mrs. Swafford was terminated and subsequently filed the complaint in this action.

I.      Procedural History

        A.      Pleading and Pre-Trial

On September 19, 1995, Mrs. Swafford filed her complaint alleging fraud in the inducement against Bobby and Betty Johnson and OHEMCO in connection with the stock purchase agreement. The Johnsons and OHEMCO answered, denying the allegations in the complaint and alleging lack of consideration for the stock purchase agreement. The parties participated in a trial management conference which resulted in the first of several orders regarding discovery and trial. This scheduling order, entered May 21, 1996, set the case for a jury trial on December 20, 1996; required disclosure of experts and T.R.C.P. Rule 26 statements by July 1, 1996; and required all expert discovery depositions be completed by September 1, 1996. The scheduling order was subsequently amended by agreement on September 6, 1996, allowing discovery to be completed by November 1, 1996. The record reveals that even after this agreement the plaintiff Swafford did not disclose her expert by the November 5, 1996 deadline. Upon motion of the defendants and agreement of plaintiff's counsel the trial was continued from its December 20, 1996 trial date. Defendant was required to file its Rule 26 expert statement by November 15, 1996, with the plaintiff to follow suit on December 15, 1996. The deadline for deposition of experts was extended to March 15, 1997. Pursuant to this order the defendants filed their Rule 26 statement on November 13, 1996 and amended their previously filed answer adding a counter complaint for negligence based, *inter alia*, on the Plaintiff's alleged failure to correctly draft and mail a rent payment, which failure led to the bringing of an eviction suit against OHEMCO. In pertinent part, that counter complaint made the following allegations:

> 7.      Said intentional and/or negligent failure to perform consists of but is not limited to the following matters:
>
>> A.      Swafford did not pay the corporation rent thereby precipitating a lawsuit by the landlord against the corporation. This lawsuit required Mr. Johnson to concentrate on resolving the problem and finding a new premises for the company. As a result, he was unable to make his sales and the corporate business suffered. This was clearly the duty of Swafford and she deliberately failed to pay the rent.
>> B.      Swafford failed to properly use corporate titles for her job position, leading to confusion with lenders and others.
>> C.      Swafford failed to prepare proper financial statements, again, damaging the company's standing with various financial institutions.
>> D.      Swafford failed to properly manage cash flow, thereby leading to financial difficulties for the company.
>> F.      Swafford ineptly prepared the Form 1120 for the fiscal year 1993.

G.     Swafford improperly booked account transactions.

H.     Swafford intentionally misrepresented her personal transactions with the company.

I.     Other acts which appear to be both intentional and negligent as a full charge bookkeeper.

On January 21, 1997, Mrs. Swafford filed her answer denying the allegations in the counter complaint and raising the following affirmative defenses:

1.     Swafford was prevented from assuming bookkeeping duties by the actions of the Johnsons.  Moreover, Swafford was actually hindered and denied essential information both before and after investment in Johnsons' business, and was continuously shut out of all operations, including bookkeeping, by the Johnsons.

2.     The Johnsons are guilty of such unclean hands against Swafford so as to warrant denial of any relief sought against her.

3.     The countercomplaint is barred by the applicable statute of limitations.

4.     The countercomplaint fails to state a claim upon which relief may be granted.

According to the technical record, this cause then languished for over a year until, on March 5, 1998, the parties agreed to set the cause for a four-day jury trial to begin on August 24, 1998.  On July 28, 1998, the plaintiff filed her motion for a continuance alleging that her expert witness was not allowed to review the records of the defendants.  The record reveals that although plaintiff had retained one Chuck Tomlin, CPA, as an expert witness, that witness was later replaced by a Sean Roach with the same accounting firm.  Plaintiff argued that this later witness was denied access to the company records.  The defendants responded arguing that all records had been disclosed.  The trial court denied the motion on August 10, 1998.  After unsuccessfully moving to amend the order denying its motion and attempting to amend the previously mentioned scheduling order, the plaintiff voluntarily dismissed her claim pursuant to Tennessee Rules of Civil Procedure 41.01.

B.     Trial and Order

The cause came on for trial on the defendants' counter claim August 24-26 before Chancellor Gray in Sumner County.  After that hearing the trial court made specific findings of fact concerning the allegations of negligence, finding in pertinent part that Mrs. Swafford negligently caused the bringing of an eviction law suit against her employer OHEMCO and Bobby and Betty Johnson.  The findings from the bench were transcribed and included in the final order by reference.  The following language is of particular note:

From the standpoint of the eviction lawsuit and the time spent there, the Court finds that he has in fact proven some damages.  And based on Mr. Mensel's testimony the Court finds that he suffered - - that the company OHEMCO suffered $33,000 in damages.  On a comparative fault basis, and this is based on Mr.

-3-

Johnson's testimony that - - it's based on his negligence and his wife's intentional not turning over to the full charge bookkeeper all the duties and responsibly she should have had. But Mr. Johnson testified that Mrs. Swafford told us we didn't have the money to pay the rent and I told her to go ahead and send it out. And the evidence is clear it wasn't sent out in time to be in Florida by the 10th day of October, the date that the rent was due.

If the Court hasn't said it, the Court did find that Mrs. Swafford had access to the information on the lease and that the check was incorrectly made out. It was not made out for the right amount of money.

But weighing all of the various factors, the Court finds that Mrs. Swafford was 55 percent at fault and the Johnsons 45 percent at fault, and the costs in this matter are assessed to Mrs. Swafford.

Mr. Cannon, you can prepare the order making final disposition in this case.

C.      Appeal

On December 21, 1998, the court denied Mrs. Swafford's motion for a new trial. Her notice of appeal was filed on January 13, 1999 with the trial court. Upon the filing of a Chapter 11 bankruptcy petition by OHEMCO, this Court stayed all proceedings on appeal by order entered October 15, 1999. By subsequent order of this Court the stay was lifted, and on June 25, 2003, this Court granted Appellee's counsel's motion to withdraw. Appellant appeared at oral argument and, represented by counsel, urged reversal of the trial court's order raising the following issues on appeal:

I.      Whether Elizabeth Swafford is entitled to an Order reversing the trial court's decision or ordering a new trial, where the trial court failed to require OHEMCO to perform prior discovery orders, failed to allow Swafford reasonable discovery, and failed to grant a continuance to allow Swafford to obtain necessary discovery.

II.     Whether Elizabeth Swafford is entitled to an Order reversing the trial court's decision awarding OHEMCO judgment based upon negligent performance of employment as a bookkeeper, where the statute of limitations barred OHEMCO from asserting all of its claims.

III.    Whether Elizabeth Swafford is entitled to an Order reversing the trial court's decision awarding OHEMCO judgment based upon negligent performance of employment where the evidence clearly demonstrates that Swafford performed within the standard of care for a bookkeeper.

IV.     Whether Elizabeth Swafford is entitled to an ORDER reversing the trial court's decision awarding OHEMCO judgment based upon negligent

performance of employment where the evidence clearly demonstrates that the negligence of OHEMCO was substantially greater than that of Swafford.

V.      Whether Elizabeth Swafford is entitled to an ORDER reversing the trial court's decision awarding OHEMCO judgment based upon negligent performance of employment where such a cause of action is not supported by modern case law, does not fulfill the common and ordinary understanding of duties and responsibility for the common law, and is contrary and abhorrent to public policy.

VI.     Whether Swafford is entitled to an order reversing the decision of the Chancery Court based upon the failure of Johnson to plead or prove damages.

VII.    The weight of the evidence presented necessitated a finding contrary to the Chancery Court's finding regarding the damages and level of fault attributable to the parties.

Inasmuch as this Court finds Appellant's negligence and comparative fault argument dispositive, we address these issues first.

III     Employee Negligence and Breach of Fiduciary Duty

The Johnsons and OHEMCO assert negligence on the part of employee Swafford. As authority for the claim, Appellees cite the reported case of *Standard Oil Co. of Louisiana v. Entriken* 4 Tenn.App. 57 (1926). That opinion involved a set-off claim raised by an employer against the back wages sought by a former employee. As grounds for the set-off, the employer, Standard Oil, urged that Entriken, a senior clerk for one of Standard Oil Company's Memphis service stations, was responsible for gasoline shortages at that station. The employee argued that he received no special instructions concerning the chargeable nature of the shortages alleged. In determining the issue in Standard Oil's favor, the court, Senter, J. writing for the majority, held:

[W]e think the record clearly shows that defendant in error knew and understood the custom of charging and holding responsible senior clerks for any shortage that would result from his conduct of the business. If, as contended by defendant in error, he was not so informed of this system and rule of the company at the time he was promoted to this position of senior clerk in August, 1925, it is clear from the record that after he became a senior clerk and while he was so employed from August, 1925, until December 15, 1925, he knew of the custom and rule that senior clerks would be held to account for any shortage resulting during the time they were on duty. He continued in the employment with full knowledge of this rule and requirement. If he did not so understand his obligation in that regard at the time he accepted the promotion in August, 1925, we think it clear from all the facts and circumstances as disclosed by the record, that he certainly acquired this knowledge and full

-5-

understanding during the time he was so employed, and if he was not willing to be bound by any such rule or custom of the company he would have so notified the company or resigned his position. While there is no direct evidence in the record that his attention had been personally called to the fact these shortages had accrued to his account, it does appear that there was posted a bulletin or list of all shortages of the respective senior clerks for the information of senior clerks, and that they had full access to these posted bulletins daily. There were about seventy-five of these senior clerks in the employ of plaintiff in error at its various filling stations in Memphis, and this rule and custom and requirement was enforced as to all of them alike. Under the system employed by defendant in error the senior clerk responsible for the shortage, if any, could be easily and definitely determined.

 . . . .

If the senior clerk exercises reasonable and proper diligence in invoicing the commodities on hand, and in determining that he does not [receipt] for a larger quantity than is delivered to him, and is careful and cautious in collecting for the cash sales and in charging any credit sales, there should be no material discrepancies. We think the duty of the senior clerk under the conditions of employment would be to exercise reasonable care and diligence in the conduct of the business with which he is charged, and even if there was no contractual arrangements by which the senior clerk would be held responsible for shortage, he would certainly owe to the employer the duty of reasonable care and diligence. We are also of the opinion that the system employed by plaintiff in error, and the rule of the company requiring employees to account for all gasoline, etc., entrusted to them, and making them liable for any shortage that may result, is a reasonable rule and condition of employment. However, the liability of said senior clerk would not be absolute and unconditional. If, for instance, it appeared that the apparent shortage was the result of theft by a third party and for which the senior clerk was not in fault; or it appeared that the measuring machinery or apparatus by which the gasoline, etc., is sold to customers were inaccurate, or perhaps for the other reasons that could be suggested, the shortage is accounted for in a way that would not make the senior clerk liable for the shortage.

*Standard Oil*, 4 Tenn.App. 57, 60-61 (1926).

Appellant makes much of the age of our rule and the dearth of case-law substantiating the proposition that an employee may be liable to her employer for negligent acts committed in the scope and course of the employment. Appellant argues that the age of this Court's decision in *Entriken* warrants its disregard in the face of current public policy and the danger of employers interposing a defense of negligence to a claim for unpaid wages. To the contrary, *stare decisis*, the foundational principle of common law precedent, necessarily implies that age alone will not militate against the application of a well settled rule of law. Indeed other jurisdictions have recognized the well settled nature of the liability of an employee to his principal:

The defendant contends that, under the facts set out in the declaration, he should be held liable only when acting wantonly or outside the scope of his employment.

He does not seriously question the existence of the recognized rule, that an agent or an employee is liable to his principal or to this employer for acts of negligence causing damage to such principal or employer, whether such damage be direct or brought about by compensation the latter has been obliged to make to some third person for injuries sustained by him arising from such negligent acts. *Page v. Wells*, 37 Mich. 415; 18 R.C.L. 502; 1 Am. & Eng. Encyc. of Law (2d Ed.) 1063; 2 Shearman & Redfield on Negligence (6th Ed.) § 242.

The defendant, however, urges that the above principle should not be held to apply to domestic servants or employees, that they should constitute an exception to the general rule and that he, as the plaintiff's chauffeur, falls within this category. In support of this contention, the defendant points out the close relationship which often exists between an employer and his domestic servants, more so than between the employer and other types of agents or employees, and also the complete oversight and control usually exercised by the employer under such circumstances.

In our judgment, the defendant's claim in this connection is not sound. While it is possibly the fact, as he states, that there is a lack of reported cases of this kind, brought by an employer against his domestic servant, this situation may well be due to practical considerations, or circumstances of a like nature. In our opinion the right of action exists. No authorities have been brought to our attention which support the proposition that, in an action of this type, a domestic servant is not liable to his employer for ordinary negligence, and we find no holding that an employer assumes the risk of such negligence. The nature of the relationship alone between an employer and a domestic servant does not warrant the creation of such an exception to the general rule.

*Darman v. Zilch*, 186 A. 21, 110 A.L.R. 826, 828 (R.I. 1936).

As late as 1984 a federal appeals court has recognized coexistence of the employer's right of action for negligence with the employee's right of action under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51, *et seq.* In *Cavanaugh v. Western Maryland Ry. Co.*, the court of appeals for the Fourth Circuit recited this very rule:

In determining whether the railroads have a right of action which they can assert as a counterclaim in an FELA action begun by a railroad employee, we begin by recognizing that there is a well accepted common law principle that a master or employer has right of action against his employee for property damages suffered by him "arising out of ordinary acts of negligence committed within the scope of [his] employment" by the offending employee. This was stated as the standard rule by the Court in *Stack v. Chicago, M., St. P. & P.R. Co.*, 94 Wash.2d 155, 615 P.2d 457, 459 (1980), which is the primary authority on which the plaintiff relies. It is also the law

as declared generally in the Annotation in 110 A.L.R. 831, and is recognized and applied in *National Grange M.I. Co. v. Wyoming Cty. Ins. Ag., Inc.*, 156 W.Va. 521, 195 S.E.2d 151 (1973), as the law of West Virginia, where the accident occurred. Moreover, this right of action in favor of the employer or master may be asserted either in an independent action by the employer against the offending employee or by a counterclaim filed by the employer in the employee's action to recover for

injuries sustained by him in the same occurrence.[3]

> [3] Of course, in either event, the action may be defeated if the master or employer has contributed to his damages by his own negligence. *Kentucky & Indiana Terminal Railroad Company v. Martin*, 437 S.W.2d 944 (Ky. 1969).

*Cavanaugh v. Western Maryland Ry. Co.*, 729 F.2d 289, 290-91 (4th Cir. 1984).

Later the New Jersey Superior Court discussed a division of authority with regard to employee liability for negligence.

> In 1961, the New Jersey Supreme Court suggested that such a rule was "anachronistic" insofar as it permitted an employer, liable to a third party for the negligence of an employee under the doctrine of *respondent superior*, to recoup the loss from the negligent employee. *Eule v. Eule Motor Sales*, 34 N.J. 537, 540, 170 A.2d 241 (1961). The *Eule* Court, quite clearly, if not explicitly, rejected the general rule, at least in the context of liability incurred as the result of negligence in operating a motor vehicle. It opined that the liability of the employer to third parties is derived from the doctrine of *respondent superior* which in turn "rests on a public policy that the employer bear the burden as an expense of the operation he expends through the employment of others." The employee should not, therefor, be required to bear that cost by way of indemnification to the employer.

> . . .

> Such a rule is consistent with the approach that New Jersey has taken in requiring a business entity to assume the costs attendant on the conduct of that business. It is analogous to our rule prohibiting an employer from seeking indemnification from a co-employee who negligently injures an employee to whom the employer is liable under our workers' compensation laws. *N.J.S.A.* 34; 15-8. *Cf. Landrigan v. Celotex Corp.*, 127 N.J. 404, 65 A.2d 1079 (1992) (imposing, as a cost of business, products liability responsibility on a manufacturer who produced products which were considered safe at the time but thereafter determined to be unsafe).

*Brown v. United Cerebral Palsy/Atlantic & Cape May, Inc.*, 278 N.J. Super. 208, 211-12, 650 A.2d 848, 850 (1994) (footnotes omitted).

These authorities place in stark contrast the rights of employees to compensation for their services and the ability of any employer to scorch the very earth from which the employee may reap his bounty. Nonetheless we find that the circumstances of the instant controversy protect our decision and the rule in *Entrekin* from extension to an unjust and absurd end. The action will lie, provided under our comparable fault rules any fault of the employer is outweighed by that of the employee. *See McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992).

IV.     The Day to Day Operations of OHEMCO and the Ambiguous Nature of Swafford's Position

The record reveals that, although Mrs. Swafford was hired as a "full-charge bookkeeper," she had no signatory authority on the corporate accounts and did not hold herself out as an accountant certified and licensed by the state and held to the higher standard of care applicable to those professionals. In fact the record also reveals that the absence of signatory authority, if not plenary authority, over accounting procedures was a source of friction between Swafford and the Johnsons. Bobby Johnson testified that he delegated the accounting authority to Mrs. Swafford. Nonetheless, upon cross examination Mr. Johnson painted a more consultative picture:

> Q.     Who would make the decision to pay the rent instead of paying the vendors?
> A.     Again, that was an accounting thing.
> Q.     So your testimony is that Mrs. Swafford made the decision of whether or not the rent would get paid or the - -
> A.     No, the final decision was not hers - -
> Q.     Whose was it?
> A.     - - always.
> Q.     Whose was it?
> A.     We could decide to pay the rent instead of a vendor just in a discussion.
> Q.     Who are you including in "we" because you'd - -
> A.     Myself and her.
> Q.     Okay.
> A.     Myself and Amelia Swafford.
> Q.     What about your wife? Would she also decide that the rent was to be paid ahead of vendors?
> A.     That's my decision.
> Q.     It was your decision. Would she ever engage Mrs. Swafford in discussions with respect to whether or not to pay the rent instead of paying other vendors?
> A.     I don't know.
> Q.     You didn't witness any?

A.      I don't remember it.

Likewise Mrs. Swafford gave the following confusing account of her day to day duties for OHEMCO:

Q.      Can you please tell us what your duties were as a bookkeeper at OHEMCO specifically?

A.      I did the daily transactions. There was supposed to be a financial statement produced each month for NationsBank in accordance with their agreement for a hundred and twenty thousand dollar note. I found it virtually impossible to do my job. Work in process wasn't in - - I don't know how to describe it. You couldn't get information from the work in process. Betty Johnson just did that out of her head in order to produce statements. Cash on delivery was very, very common. It used to go in the back of the shop. I didn't have information to enter this stuff. I never received the first expense check from Mr. Johnson. Let me think. Betty Johnson had stacks and stacks and stacks of work on her desk going back six months, eight months, I'm not real sure, maybe longer that was sales. I didn't know what they were.

As regards paying bills, can I explain that?

Q.      Sure.

A.      I took a current accounts payable, I copied it from the purchase journal where we entered these payables. I copied a current one each month. I copied a current accounts receivable from the sales journal each month. I presented it to Betty Johnson. She was familiar with checks being held. I wasn't. She was familiar with sales; I wasn't. She knew the money situation. She told me what to pay.

Q.      Did you sign the checks, Ms. Swafford?

A.      No, I did not. I had no authority.

Q       Who could sign checks?

A.      Bobby Johnson and Betty Johnson.

Q.      Who was the one in your experience at OHEMCO that signed the checks most often?

A.      Betty Johnson.

Q.      Did you report directly to her in your activities?

A.      Yes.

Thus the parties operated, albeit disfunctionally, until October of 1994. The picture painted by the testimony of Swafford and Johnson is one of miscommunication. Mrs. Swafford at the direction of Mr. Johnson drafted a check for $2,400 for a rental payment, which pursuant to the terms of OHEMCO's lease with Marlene Gaskins was to be $2,520. According to the record before us, OHEMCO had been behind on its rental payments off and on prior to October 1994. The trial court specifically found that Mrs. Swafford was aware of the terms of the rental agreement and of the fact that the landlord would be requiring strict compliance with the lease including the increased payment of $2,520 due on the 10th of October. The check was not drawn until the 8th of October on a

Saturday. It was presented to Betty Johnson some time after that date but prior to October 12, 1994 which is the date of the postmark on the envelope in which the rental check was mailed. It is this alleged failure on the part of Mrs. Swafford to timely and accurately pay OHEMCO's landlord pursuant to its lease that constitutes OHEMCO and Johnsons' claim for negligence. Nonetheless Mrs. Swafford acted under the direction of the Johnsons, who had equal if not superior knowledge of the lease terms. The record shows that the landlord returned the tendered rent payment and filed suit for possession of OHEMCO's leased premises on October 31, 1994.

The appellees asserted at trial that this failure violated the duty of reasonable care owed by a full-charge bookkeeper to her employer, which violation proximately caused Mr. Johnson's inability to obtain sales during the period when he was attempting to resolve the resulting lease dispute. Mr. Johnson gave the following testimony concerning the damages sought:

Q. Now, I had mentioned in my opening statement that we were seeking the sum of $157,000. Where does that come from? How did you arrive at that as a damage figure?

A. That figure only is the addition of the loss plus the next year's retained earnings.

Q. Up until October 31st of 1994 when the lawsuit hit, had Old Hickory Engineering - - OHEMCO - - been increasing its sales in profitability?

A. Yes. Again, at record levels.

Q. To what do you attribute the sudden and rapid decline in sales and profitability after October 31st of 1994?

A. My inattention to sales.

Q. Why were you inattentive to sales?

A. I was looking for a place to go with respect to the lease eviction lawsuit.

Q. Why was the lease eviction lawsuit ever filed?

A. Because we didn't send $2,520 to Marlene Gaskins and place it in her hands before the 10th of October 1994.

Q. Whose job was it to have done that?

A. Amelia E. Swafford's.

Mr. Mensel, the appellant's expert at trial, testified to the drop in sales resulting from the lawsuit occasioned by the inadequate payment:

BY MR. CANNON:

Q. Now, while we're at it, for the sake of the record, Mr. Mensel, let's do give the exact numbers. We want to be precise on this one.

A. Going back, starting - - I've got it back to the first quarter of 1991.

Q. Let's concentrate, really, on the end of 1993.

A. Okay. The third quarter of '93 sales were 32,700. I'll round this off to near hundreds, or I can give it to you in dollars.

Q. Round it off nearest is fine.

A. Fourth quarter, 36,200; first quarter of '94, [fifty]-nine thousand five; second quarter, a hundred and eighty-five thousand six; third quarter, two hundred and fifteen thousand nine; fourth quarter a hundred and twenty-one thousand four; first quarter of '95, eighty-six thousand seven; second quarter, a hundred and one thousand seven; third quarter a hundred and fifty-five thousand eight; fourth quarter, a hundred and fifty-one thousand two.

Q. Those were the numbers that you used in calculating the graph which we have submitted as Exhibit Number 20; correct?

A. Yes, sir.

Q. Were you able to form an opinion, sir, regarding the cause of the sales drop following the filing of the landlord lawsuit in the last quarter - - or excuse me, the third quarter of 1994?

A. I have a professional opinion.

Q. What is that opinion, sir?

A. That Mr. Johnson's energies were so diverted by the lawsuit with Ms. Gaskins that he was unable to concentrate on the day-to-day running of OHEMCO.

Q. Now, as far as the payment of the rent, had you made a determination based on the books and record of the company as to whose job it was to pay the rent?

A. The bookkeeper's.

Q. That would be Ms. Swafford?

A. Yes, sir.

Q. Is that part of her - - excuse me. Let me rephrase that. As a full-charge bookkeeper, would the payment of rent be part of her reasonable and ordinary care toward the company?

A. It would.

Q. Something that a bookkeeper's supposed to do?

A. Yes, sir.

The trial court took this testimony into account when assigning fault to the appellants Johnson and OHEMCO in the amount of 45%. This finding of fact comes with a presumption of correctness pursuant to Tennessee Rules of Appellate Procedure 13(d). However, we find that the evidence preponderates against that finding and in favor of an equal apportionment to the counter-plaintiffs and to the defendant. The record shows that all parties shared equally in the failure to forward timely and correct payment. Mrs. Swafford's apparent unwillingness to be supervised, and the defendants' unwillingness to share information contributed in equal measure to place the leased property at risk. The accounting policies in place at OHEMCO and devised at the Johnsons' instance placed their responsibility of signing the checks on their shoulders. The testimony of the expert Mensel notwithstanding all parties bore the responsibility for the rental payment.

The lease payment had two deficiencies. First, it was late. This was the fault of Mrs. Swafford. Secondly, it was in an insufficient amount. Betty Johnson had to know this as only Betty or Bobby Johnson had authority to sign checks. Betty Johnson signed the rent check.

When the evidence so preponderates against the finding of the chancellor it is our duty to enter such decree as the law and evidence warrant. *See Thornburg v. Chase*, 606 S.W.2d 672 (Tenn.Ct.App. 1980). Consistent with this duty we find that the comparative fault of the counter-plaintiffs bar recovery. The trial court is reversed and judgment is entered in favor of Amelia Swafford. Costs are assessed against Bobby and Betty Johnson.

_____
WILLIAM B. CAIN, JUDGE